*IN THE UNITED STATES COURT OF APPEALS*

*FOR THE FIFTH CIRCUIT*

_____

*No. 96-10303*
_____


*ERNEST MOSLEY,*

*Plaintiff-Appellant,*

*versus*

*EXCEL CORPORATION,*

*Defendant-Appellee.*
_____

*Appeal from the United States District Court for the*
*Northern District of Texas, Lubbock*
_____

*March 26, 1997*
*Before JOLLY, JONES, and PARKER, Circuit Judges.*

*E. GRADY JOLLY, Circuit Judge:*

This appeal arises from a claim against a meat packing company, Excel Corporation ("Excel"), which is a non-subscriber under the Texas Workers' Compensation system and is therefore liable for negligence to its employees. Excel was sued by Ernest Mosley, an employee who suffers from bilateral carpal tunnel syndrome because, according to his contention, Excel negligently failed to provide safe working conditions. The jury returned a verdict in favor of Mosley and awarded $360,000 in damages. The trial judge, however, was not impressed with Mosley's evidence on

*causation and granted Excel's renewed motion for judgment as a matter of law. He further conditionally granted Excel's motion for new trial in the event the judgment as a matter of law was vacated or reversed on appeal. Mosley appeals and seeks to have the judgment as a matter of law reversed, the conditional grant of a new trial vacated and the jury verdict reinstated. We affirm the judgment of the district court.*

I

*Excel operates meat packing plants throughout the country, including a plant in Plainview, Texas. Mosley is employed at the Plainview plant and has been an employee there, in various capacities, since 1981. At the time in question, Mosley worked as a supervisor in the "break area" of the plant.[1] As supervisor of the break area, Mosley was responsible for assuring that all jobs in the department were adequately performed.*

*Mosley, however, contends that chronic absenteeism caused his department to be understaffed. Consequently, he spent between sixty and seventy percent of his time working as a skirt puller,[2]*

---

[1] The break area is the portion of the plant where the beef carcasses are broken down so that they can be distributed to various areas throughout the plant. The break area encompassed several jobs, including wing operator, frank cutter, scaler, rail watcher, and skirt puller.

[2] A skirt puller is the individual responsible for cutting the skirt steak out of a beef carcass. In order to perform the job, a

*one of several positions in his department, in order to provide*

*adequate personnel for that position. It is this work, replacing*

*the regular skirt pullers, that Mosley contends caused his carpal*

*tunnel syndrome.[3] Mosley contends that Excel failed to provide a*

*safe workplace because of the negligent failure to implement*

*adequate "precautionary" measures--such as decreased production*

*rates and increased staff size--that he alleges would have aided in*

*the prevention of cumulative trauma disorders such as carpal tunnel*

*syndrome.[4]*

*At the conclusion of the trial, the jury returned a verdict*

*for Mosley and awarded damages. The trial judge then granted*

*Excel's renewed motion for judgment as a matter of law, holding*

*that Mosley "failed in [his] burden to produce legally sufficient*

---

puller uses a hook, held in his left hand, to hold a carcass steady as it travels along a suspended chain. As the puller uses the hook to stabilize the carcass, he walks alongside the carcass and removes the skirt steak using a knife held in the right hand. It takes an average of six cuts to remove a steak.

[3]The parties do not dispute that Mosley suffers from carpal tunnel syndrome in both wrists. In fact, Mosley has undergone three surgeries to alleviate the problem. Excel paid all of the expenses related to the surgeries and the corresponding non-surgical treatment.

[4]Cumulative trauma disorders are injuries that result from the "wear and tear" on the tissue surrounding joints, ligaments, and tendons. These injuries are distinguished within the meat packing industry from accidental injuries that are the result of an identifiable occurrence.

*evidence that any act or omission on the part of Defendant, EXCEL CORPORATION, was a cause in fact of [Mosley's] injuries, and that [Mosley] failed in [his] burden to produce legally sufficient evidence to show that [his] injuries were reasonably foreseeable from the work activities associated with the employment at EXCEL CORPORATION."  Accordingly, the district court entered judgment in favor of Excel.  Mosley appeals.[5]*

*II*

*A*

*We review the grant of a judgment as a matter of law using the same standard utilized by the trial court in granting the motion. Crosthwait Equip. Co. v. John Deere Co., 992 F.2d 525, 528 (5th Cir.), cert. denied, 114 S.Ct. 549 (1993).  The standard of review, as set forth in Boeing Co. v. Shipman, instructs us to*

> *consider all of the evidence--not just that evidence which supports the non-mover's case--but in the light and with all reasonable inferences most favorable to the party opposed to the motion.  If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper.  On the other hand, if there is substantial evidence opposed to the motion[], that is, evidence of*

---

[5]Mosley also appeals the trial court's grant of judgment as a matter of law in favor of Excel on the issues of gross negligence and punitive damages and the conditional grant of a new trial in the event the judgment as a matter of law was reversed.  Our resolution of the appeal of the judgment as a matter of law on the liability question renders these other grounds of appeal moot.

4

*such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion[] should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motion[] . . . should not be decided by which side has the better of the case, nor should [it] be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.*

*411 F.2d 365, 374-75 (5th Cir. 1969) (en banc). It is therefore our task today to consider all of the evidence, construed in favor of Mosley, and to determine whether the evidence supports the jury's verdict. Upon such review, we conclude that, because of the lack of a "conflict in substantial evidence," the judgment as a matter of law should be affirmed.*

*B*

*Mosley's sued Excel in federal district court in Texas, basing jurisdiction on the total diversity of the parties.[6] See 28 U.S.C. § 1332. Texas substantive law therefore controls Mosley's negligence claim. Thus, Mosley was required to demonstrate that Excel owed a specific duty to him, that Excel breached that duty,*

---

[6]Mosley is a resident of Texas, and Excel is a Delaware corporation with its principal place of business in Kansas. The amount in controversy exceeds the jurisdictional requirement of $50,000.

that Excel's breach caused his injury, and that he suffered damage as a result of Excel's breach. *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987). The district court held, in granting the judgment as a matter of law, that Mosley failed to establish causation.

Causation has two components, cause in fact, or "but for" cause, and foreseeability. *See Doe v. Boys Clubs of Greater Dallas*, 907 S.W.2d 472, 477 (Tex. 1995). Proof of causation requires more than conjecture or guess, and the existence of a causal link between Mosley's injury and Excel's negligence must be demonstrated by the introduction of probative evidence. *Id.* There need not, however, be direct and positive proof, as the jury may infer proximate cause "from the circumstances surrounding the event." *B.M. & R. Interest v. Snyder*, 453 S.W.2d 360, 363 (Tex. Civ. App. 1970).

### C

We turn now to examine whether Mosley's evidence was sufficient to allow the jury to return a verdict in his favor. It is important to note at the outset that Mosley was required to prove that some negligent act or omission by Excel actually caused his bilateral carpal tunnel syndrome, not merely that his work as a replacement skirt puller led to his injuries.

*At trial Mosley presented three witnesses: (1) Steve Steffe, the Safety Director and Occupational Benefits Coordinator at Excel; (2) Andrew Jackson, a former Excel employee; and (3) Chris Flores, a former light duty class instructor at Excel. Mosley also testified on his own behalf. During the testimony of these witnesses and during cross-examination of witnesses called by Excel, Mosley also presented various documentary evidence including several publications relating to ergonomics[7], the records of reported injuries at Excel, and his medical file from Excel. Additionally, Mosley introduced into evidence--through no witness-- medical records from six treating physicians and/or hospitals, as well as three other ergonomics publications. To determine whether this evidence is sufficient to support a jury verdict that Excel's negligence caused Mosley's injuries, we must examine it in some detail.*

*(a)*

---

[7]Ergonomics is the "applied science concerned with the characteristics of people that need to be considered in designing and arranging things that they use in order that people and things will interact most effectively and safely." Webster's Third New International Dictionary (1993). In the employment context, ergonomics deals with efforts to fit a job to a person in order to make the job physically easier to perform.

*Mosley called Steve Steffe to testify regarding the ergonomics program at Excel and the number of cumulative trauma disorders at the plant. Steffe testified that he was currently employed as the safety director and occupational benefits coordinator at Excel and that he had been directly involved with the ergonomics program at the plant in the late 1980's or early 1990's. Through this witness, Mosley introduced two publications detailing ergonomic guidelines and suggestions[8] and the injury log for the plant in 1991 and 1992.[9] Steffe testified that although he was responsible for O.S.H.A. compliance at the plant he could not recall whether he had reviewed the O.S.H.A. guidelines provided in 1990. He further acknowledged that the causes of cumulative trauma disorders, according to the O.S.H.A. publication, included repetitive and/or prolonged activities, forceful exertions, prolonged static postures, awkward postures of the upper body, and cold temperatures among others and that the position of skirt puller involved some of those factors. The materials introduced by Mosley suggested*

---

[8]The two publications admitted into evidence were: <u>Ergonomics Program Management Guidelines for Meatpacking Plants</u> (O.S.H.A. 1990) and <u>Ergonomics for Management--Excel</u> (ErgoTech, Inc. 1991).

[9]The injury log is an O.S.H.A. 200 log that reports all injuries at the plant requiring more than a single visit to the nurse's office. Injuries of this type are known as O.S.H.A. reportables and include both accidental injuries and cumulative trauma disorders.

*modifying jobs and plant conditions in order to reduce the risk of injuries to workers. Modifications suggested by these publications included reducing the chain speed, increasing staffing, reducing repetitions required by jobs, providing frequent rest pauses, and allowing job rotation.*

*When Steffe was questioned regarding the number of cumulative trauma disorders that occurred at the plant around the time Mosley was injured, the following statistical picture emerged. At the time of Mosley's injury Excel employed approximately 1600 production workers, with 800 employees working each of two shifts. In 1991, there were approximately 500 reported cumulative trauma disorders of one type or another at the plant and in 1992, there were just less than 400 reported cumulative trauma disorders. These figures led to an occurrence rate over four times as great as the industry average of eight percent reported by the Bureau of Labor in 1990. Workers employed as skirt pullers in the plant reported five cumulative trauma disorders of one type or another in 1991 and four such disorders in 1992.*

*Finally, Steffe did not dispute that Mosley's injury was related to his work.[10]*

---

[10]Because Excel paid all of Mosley's medical expenses relating to his carpal tunnel syndrome, Steffe may have had little choice but to admit that the injury was work related. Steffe did not,

*Mosley then testified on his own behalf. Mosley testified that frequently the breaking department was understaffed.[11] Specifically, he stated that often there would be only three skirt pullers present to fill the four positions in that area. He stated that when there were only three skirt pullers working he would usually fill in for the absent worker in order to keep up with the pace of production.[12] Mosley testified that he worked as a replacement skirt puller three, or maybe four, nights per week and that he spent approximately sixty to seventy percent of his time working in that position even though he was employed as a supervisor and was not supposed to be working on the line. Mosley testified that working as a skirt puller was difficult because it required the worker to work above his head with the knife and because the meat was sometimes hard to cut.*

*Mosley further testified that the night shift began at 3:30 p.m. and ran until 12:00 a.m. with only one fifteen minute break*

---

however, concede that Excel negligently caused the injury.

[11]Mosley stated that his department was designed for 30 employees but that often he had only 26 workers present.

[12]It is this work as a replacement skirt puller that Mosley contends caused his injury. Mosley's claim against Excel is based upon the alleged negligent practice of failing to adequately staff the plant and the failure to reduce the chain speed.

*and a half-hour break for dinner. He stated that he did not remember anyone ever coming to his department to perform symptom surveys or to observe the workers and he never recalled any member of management discussing allowing more frequent rest breaks. Mosley testified that he thought a lot of people were getting hurt at Excel and that the company could have prevented some, or all, injuries by reducing the chain speed and/or increasing staffing. He stated that his supervisors were unresponsive to his requests for additional staffing or, in the alternative, reduced chain speed.*

*Although Mosley continues to work at Excel on the kill floor without apparent difficulties, he testified that his hands still caused him pain at times and interfered with certain aspects of his life, such as playing with his children.*

*(c)*

*Next, Andrew Jackson testified for Mosley. Jackson was formerly employed with Excel and worked under Mosley in the breaking department. Jackson testified that the department was often understaffed (the regular staffing was four skirt pullers) and that Mosley worked as a skirt puller when there were only three skirt pullers present. He further stated that the chain speed would be reduced when there was serious problem with understaffing*

11

*but not when only one worker was absent.  Jackson also testified that as a lead man in the plant he was supposed to act as a floater to relieve workers periodically but instead usually substituted for an absent worker.  He testified, generally, that he saw lots of workers with hand and shoulder injuries during his employment with Excel and that he never remembered anyone observing the floor in an effort to develop an ergonomics plan.*

*(d)*

*Next, Chris Flores testified that he previously was responsible for "light-duty classes," instructional classes held at the Excel plant for employees placed on temporary light duty for medical reasons.  He stated that these classes were designed to encourage workers who had been injured to return to work as soon as possible.  He admitted that the workers were, on occasion, humiliated, by being called names and by being required to perform menial tasks, in an effort to speed their recovery while in these classes.*

*(e)*

*Just prior to resting his case, Mosley offered medical records from six treating physicians and/or medical facilities and three additional ergonomics publications.  The medical records establish that Mosley suffers from carpal tunnel syndrome and that he has*

12

undergone three surgeries to alleviate the problem. The ergonomics publications reiterate the information on cause and prevention of various cumulative trauma disorders.

In defense, Excel called only three witnesses: (1) Steve Steffe; (2) Jim Maher, the former human resources manager for Excel in Plainview; and (3) Dr. Tom Jetzer, an occupational medicine practitioner. Additionally, Excel introduced several employee handbooks used at Excel, including the safety code and the benefit plan.[13] Again, it is necessary for us to take a thorough look at this evidence in order to reach a decision on this appeal.

(a)

Dr. Tom Jetzer, an occupational medicine practitioner, was called as an expert witness by Excel. Jetzer testified that although workplace factors such as repetition, wrist position and grip force are considered to be potential causes of carpal tunnel syndrome, the injury also could occur as the result of a genetic predisposition to the problem, as the result of the natural aging process, or as the result of non-work activities such as participating in sports or playing the piano. Jetzer testified that after reviewing Mosley's medical records, viewing the tape of the work performed by the skirt pullers at Excel, and considering Mosley's intermittent work as a skirt puller, his opinion, based

---

[13]These documents appear only to offer support for the testimony of the witnesses and have little independent value to our review. We therefore will not elaborate on their contents.

*upon his knowledge of cumulative trauma disorders and, specifically, carpal tunnel syndrome, was that Mosley's injuries were idiopathic, i.e. that they occurred spontaneously or from an unknown cause and not from his work as a skirt puller. Jetzer also testified that the requirements of the skirt pulling position appeared reasonable under current ergonomic standards.*

*Jetzer premised his opinion regarding the cause of Mosley's injuries on several observations. First, he noted that Mosley did not suffer from degenerative problems in his shoulders as would be expected if the carpal tunnel syndrome was caused by the work. Jetzer stated that the job put more stress on the shoulders than on the wrists and that if the work caused the injury to Mosley's wrists it would be expected that he would also experience some related shoulder problems. Second, Jetzer observed that the position of the left hand when holding the hook did not support a finding of causation, yet Mosley experienced carpal tunnel syndrome in his left hand as well as his right. Jetzer noted that the left wrist was kept in a neutral position and that merely stabilizing the carcasses would not be considered a potential cause of carpal tunnel syndrome. Jetzer conceded that static load[14]--a suggested*

---

[14]Static load is defined as the continuous use of muscles or groups of muscles to oppose the force of gravity.

risk factor in the development of cumulative trauma disorders--was present in the use of the left hand in the skirt pulling job; however, he noted that static load was not generally associated with carpal tunnel syndrome but was a greater problem with respect to cumulative trauma disorders involving the shoulders. Third, Jetzer noted that Mosley did not perform the job on a regular basis over an extended period of time and thus, he testified that he would not expect to see problems flowing from the work. He noted that the sporadic performance of the job was essentially equivalent to a rotation schedule, which is one of the means of combating the occurrence of cumulative trauma disorders.

(b)

Steve Steffe was recalled as a witness by Excel to testify again regarding the safety practices at Excel and the number and type of injuries occurring at the plant. Steffe testified that Excel trained all of its employees immediately to report any injury in order to allow the company to treat the problem as soon as possible. Steffe also stated that the injury rate used by Mosley was inaccurate because the number of employees used in calculating the rate did not take into account the approximately forty percent

*turnover rate at the plant.[15]  Additionally, Steffe testified that*

*the cited rate of cumulative trauma disorders was misleading*

*because of the range of injuries required to be recorded as*

*O.S.H.A. reportables.  He noted that any soreness that required*

*more than an initial visit to the plant nurse was a reportable*

*injury regardless of its severity.  Steffe testified that Mosley*

*was the only person working as a skirt puller in 1992 who had lost*

*time as the result of surgery for carpal tunnel syndrome.  He also*

*noted that the other cumulative trauma disorders reported by skirt*

*pullers involved complaints concerning a forearm, a wrist, a thigh*

*and a shoulder--with only the first two even potentially similar to*

*Mosley's injuries.*

*(c)*

*The final witness called to testify by Excel was Jim Maher,*

*former human resource manager for the Plainview plant.  Maher*

*testified that after the implementation of the ergonomics program*

*at Excel in the early 1990's, both the number of cumulative trauma*

---

[15]Steffe's testimony was that, although Excel had approximately 1500 positions, the total number of workers in those positions per year was 2300 because of rapid employee turnover in the plant. Mosley's injury rate percentages were calculated based upon the lower number and therefore reflect an inflated picture of the injury situation at Excel.  The parties dispute the turnover rate and consequently the actual number of workers employed by Excel; however, it is clear that using the actual number of positions available at the plant to calculate the injury rate was inaccurate because of the considerable turnover among the employees.

*disorders reported and the number of days absent from work for injuries decreased. He reiterated that Mosley was the only employee working as a skirt puller that required surgery for carpal tunnel syndrome in 1992 and further stated that only four other injuries in the nature of cumulative trauma disorders were reported by skirt pullers during that year.*

*3*

*In addition to the direct evidence presented by each party in support of its position at trial, there was other evidence that emerged through various cross-examinations. To the extent that this evidence sheds light on the question of causation, we turn now to review it.*

*(a)*

*Jetzer, on cross-examination stated that Mosley's carpal tunnel syndrome appeared more severe in his right hand than in his left hand. This, he stated, would be consistent with the use of a knife in the right hand and a hook in the left hand.*

*(b)*

*Mosley testified on more than one occasion that when four workers were pulling skirts the job could be done at the regular production pace without undue risk of injury to the workers. Mosley also testified that after a skirt puller finished cutting the skirt steaks out of a carcass and walked back to pick up another carcass, the worker could talk to co-workers, relax his grip on the knife and hook, and have a brief opportunity to stretch his hands before repeating the procedure on the next carcass.*

*Jackson, the former breaking department employee, testified that when the skirt pulling department was very short-handed the chain speed would be reduced but that when only one skirt puller was absent then the speed remained the same and that Mosley often filled in for the fourth worker.*

*D*

*In the light of this evidence and all reasonable inferences that can be drawn from it in favor of Mosley, we now consider*

19

whether the trial court erred in concluding that there was no "*conflict in substantial evidence*" regarding causation and thus concluding that Excel was entitled to judgment as a matter of law.

We will first examine Mosley's evidence of cause in fact, or "*but for*" cause. In this context, it is important to recognize the precise claim advanced by Mosley. He specifically claims that his carpal tunnel syndrome resulted from his work as a skirt puller. When asked to pinpoint exactly what Excel had done wrongly to cause his injuries, Mosley replied that the plant was understaffed and the chain speed was too rapid.

1

First, we note that the evidence is weak that Mosley's particular injury is, in fact, job related. We should note at the outset that, although not necessarily required to make his case, Mosley failed to present any expert testimony. Instead he relies upon extrapolation from the testimony of Jetzer, upon his own testimony, upon the testimony of a former co-worker, and upon several sets of medical records detailing his treatment for the injuries. Jetzer acknowledged that Mosley's injuries were <u>consistent</u> with using a knife in the right hand and a hook in the left. Jetzer also testified that, if the work were the cause of Mosley's injuries, he would not expect to see any injury in the

20

*left hand. Jetzer stated that, in his opinion, Mosley's carpal tunnel syndrome was idiopathic in nature. Mosley presented no evidence that specifically disputes this conclusion.*

*Mosley offered significant evidence that other workers doing similar, or even identical, work suffered from various cumulative trauma disorders. Indeed, Mosley showed that Excel's injury rate in 1990 was higher than the industry average--although the precise injury rate remains uncertain. Mosley also presented evidence that Excel, notwithstanding its claim otherwise, was often indifferent to safety concerns, particularly in the general area of ergonomics. Mosley presented evidence that he frequently worked as a skirt puller because of absenteeism in the department. His evidence showed that his injuries--with the more severe problem in his right hand--were <u>consistent</u> with an injury caused by the job of skirt pulling. On the other hand, Mosley offered no evidence of a more-probable-than-not connection between his actual injury and this work specifically. There was evidence, which his evidence completely failed to address, that there were other equally plausible sources of his specific injury. He failed to address the evidence--in the form of expert testimony from Dr. Jetzer--that his carpal tunnel syndrome was idiopathic. The medical records offered contain only Mosley's treatment history and establish only that he*

21

*suffers from carpal tunnel syndrome; they do not establish a causal link to his work as a skirt puller.  Mosley's general evidence of plant wide negligence, his evidence of Excel's poor safety record generally, his evidence of other workers' injuries, and his evidence that his injury is <u>consistent</u> with a hypothetical work related injury hardly creates a substantial conflict with the specific evidence offered by Excel that his injury is not job related, given that it is undisputed that the injury has other plausible sources.  In the light of Steffe's testimony that Mosley's injury was job related, however, we will assume that the jury reasonably could have concluded that Mosley's carpal tunnel syndrome was related to his work as a replacement skirt puller.*

*2*

*Even if we assume, however, that the evidence demonstrated a causal connection between Mosley's injuries and his work as a skirt puller, Mosley has failed to establish his tort claim.  As we underscored earlier in this opinion, Mosley is required to demonstrate more that a causal relationship between his job and his injury.  He must show that his injury was job related <u>and</u> that the negligence of Excel caused the injury.  Mosley alleges that Excel negligently caused his injury by failing adequately to staff the plant and by running the production chain too rapidly.  The*

22

*evidence indicated that the rate of the chain was dependent upon the number of workers present. Jackson testified that the chain speed was reduced when there were only one or two skirt pullers present to fill four positions but that the speed was not reduced when there was only one skirt puller absent. Mosley testified that he frequently filled in on such occasions to provide a full shift of skirt pullers. Although Mosley testified that he spent between sixty and seventy percent of his time pulling skirts, there is no evidence that he ever worked at the job when there were less than four total workers--including himself--on the line.[16]  Mosley, on*

---

[16]Mosley testified as follows:

> Q.  Okay.  How many people were working as skirt pullers?
> A. [by Mosley] We should have had four, but a lot of times we only had three skirt pullers.
> *****
> Q.  What did you do when you were short-handed?  Did you ask about the chain speed--to have it reduced?
> A.  Yes, I did.
> Q.  And would the chain speed be reduced if you had three people compared to if you had four skirt pullers?
> A.  No, sir, it would not.
> Q.  Would it run the same speed as it would with four as it would with three?
> A.  Yes, it would.
> Q.  What did you do about that?
> A.  Eventually I learned how to do the job so that I could help my employees out, so they wouldn't have to run short-handed a lot of times.

Record Volume 3, at 107, 109.

Furthermore, Jackson testified:

> Q.  When you all were short-handed, would they

*more than one occasion, testified that when four workers were*

*available as skirt pullers the job was not unduly dangerous.*[17]   *In*

---

> reduce the chain speed for you to make it
> easier to keep up?
> A. [by Jackson] Well, if we were real short-
> handed they would.  I mean, you know, if you
> [had] three skirt pullers, they wouldn't.
> That is when Ernest [Mosley] had to get on
> line.

Record Volume 3, at 212.

[17]Specifically, Mosley testified:
> Q.  Even when you had four people doing skirt
> pulling, counting yourself, was that enough
> people, considering the speed of the chain and
> the pace of the work, to do it safely without
> people getting hurt?
> A. [by Mosley] Yes, sir.

Record Volume 3, at 110.

Later, Mosley testified:
> Q.  But you also told the ladies and gentlemen
> of the jury, that if you had four [skirt
> pullers], that was sufficient to do the job.
> A. [by Mosley] Yes, it was.

Record Volume 3, at 135.

On yet another occasion, Mosley testified:
> Q.  My question, Mr. Mosley, was that you had
> four people, and if you were one of those four
> people in the skirt line the job could be done
> okay, couldn't it?
> A. [by Mosley] For me--it was tough on me.
> Q.  Well, was it tough on the rest of the
> [line workers]?  You said a minute ago that it
> could be done easily with four people.
> A.  If they were trained and knew how to do it
> and stuff; yes, sir.

Record Volume 3, at 136.

Still later, Mosley testified:
> Q.  And the short-handed, you are telling us
> about when you just have three people;
> correct?
> A. [by Mosley] Yes, sir.
> Q.  And when you have . . . four people, you
> can do the job fine.

*short, the record shows that Mosley only worked as a skirt puller*

*when it was admittedly safe to do the job on the basis of the*

*number of workers and the pace of production. Thus, the record is*

*bereft of any evidence that Mosley's injury is connected to the*

*negligence that he alleges or proved.[18]*

### III

*We conclude that the evidence presented at trial fails to*

*establish Mosley's claim. Although we consider the evidence that*

*Mosley's injury was job related to be weak, we acknowledge that,*

*under the strict review required before overturning a jury verdict,*

*the jury could have found that the work as a skirt puller caused*

*Mosley's carpal tunnel syndrome. We hold, however, that Mosley*

*failed to offer evidence that linked his injury to any act of*

*negligence on the part of Excel. This was a necessary element of*

*Mosley's case, and the failure to demonstrate a causal relationship*

---

A.  You can do a whole lot better than you can with three people.
Q.  Well, and awhile ago you told us that you could do the job fine with four people?
A.  Yes, sir, you can do it with four people fine.

Record Volume 3, at 156.

[18]Because we conclude that Mosley failed to establish cause in fact, we need not address the question of the foreseeability of his injury.

*between Excel's negligent acts or omissions and the specific injury*

*bars recovery on the claim.*[19]

*The judgment of the district court is therefore*

*A F F I R M E D.*

---

[19]Although our holding makes consideration of the jury award of $360,000 unnecessary, it appears to be excessive. We base this observation on the fact that the award included $250,000 as compensation for loss of earning capacity in the future. There is no evidence in the record supporting this award. Mosley voluntarily resigned his position as a supervisor but continues to work for Excel and also works a second job. Thus, it is difficult to ascertain the basis of the jury award. The amount of damages served as the basis of the trial court's conditional grant of a new trial pending reversal of the judgment as a matter of law now on appeal. Mosley appeals the new trial ruling, but, as noted above, our affirmance of the judgment as a matter of law moots this issue.

Robert M. Parker, Circuit Judge, dissenting:


After considering all of the evidence, construed in favor of Mosley, I have concluded that the record supports the jury's verdict. The majority states that "there is no evidence that [Mosley] ever worked at the job when there were less than four total workers -- including himself -- on the line. . . . [T]he record shows that Mosley only worked as a skirt puller when it was admittedly safe to do the job on the basis of the number of workers and the pace of production." In fact, there was no direct evidence concerning how many other people worked the line when Mosley did. However, the evidence was clear that the line often had to function short handed, with one to three trained skirt pullers and that Mosley filled in when they were short handed. The jury could have reasonably concluded that Mosley worked as a skirt puller when the line was one or two or three people short. Is seems irrational to conclude, as the majority does, that he filled in when only one person was absent, but did not fill in on shifts when two or more people were absent. Further, Mosley testified that the chain speed was safe for four *trained* people, but "it was tough on me."

The majority's whole conclusion hangs on this faulty hook. It does not go on to address the question of foreseeability. The record contains evidence that there were high injury rates which had been reported to Excel, that Excel's ergonomics expert recommended rest pauses and that workers were not allowed pauses, even after Mosley requested such changes. I therefore conclude that the record supports the jury's verdict and that the district court erred in granting Excel's motion for judgment as a matter of law.

For the foregoing reasons, I respectfully dissent.