**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

No. 96-11164

---

SPORTSBAND NETWORK RECOVERY FUND, INC.,
SPORTSBAND NETWORK, INC., AND
SPORTSBAND NETWORK I, LTD.,

Plaintiffs-Appellants,

versus

PGA TOUR, INC.,

Defendant-Appellee.

---

Appeal from the United States District Court
For the Northern District of Texas
(92-CV-2679)

---

January 30, 1998

Before KING, DUHÉ, and WIENER, Circuit Judges.

WIENER, Circuit Judge:[*]

Plaintiffs-Appellants SportsBand Network Recovery Fund, Inc.,

SportsBand Network, Inc., and SportsBand Network I, Ltd.

(collectively, SportsBand) appeal the district court's grant of a

judgment as a matter of law (j.m.l.) in favor of Defendant-Appellee

PGA Tour, Inc. (PGA), overturning the jury's verdict for SportsBand

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

on its breach of contract claim. SportsBand also appeals the district court's grant of a j.m.l. in favor of PGA on SportsBand's fraud claim after SportsBand had presented its case in chief. Finally, SportsBand claims that the district court erred by excluding the testimony of its expert witness on the issue of lost profits and thereafter rejecting its lost profits claim. We find none of these contentions persuasive and, accordingly, affirm.

**I**

**FACTS AND PROCEEDINGS**

**A. Facts**

The events leading to this litigation stem from a failed business venture between SportsBand and PGA to promote and market on-site radio broadcasts to spectators at professional golf tournaments. PGA is a non-profit corporation serving as a membership/trade association for golf professionals in the United States.

In 1986, SportsBand's eventual founders, Frank Mitchell and Theis Rice, approached PGA with the idea of conducting commercial, closed-circuit, on-site radio broadcasts[1] at PGA-sponsored events.

---

[1]The concept behind SportsBand was that professional sportscasters attending golf tournaments would broadcast play-by-play coverage and other news over an FM transmitter. SportsBand spectators would listen to the broadcasts — carried over FCC licensed radio frequencies — through lightweight ear pieces that accompany a small receiver, which would be obtained by spectators when they entered the tournament. It would allow spectators to hear stroke-by-stroke coverage of the play at multiple holes.

2

The parties entered into a preliminary agreement to assess the idea: Mitchell and Rice agreed to submit a plan for developing the broadcasts, and in return PGA granted them broadcast exclusivity. Mitchell and Rice submitted a plan addressing key business aspects and offering a pilot broadcast at no cost to PGA. PGA accepted the proposal and requested the pilot, which met with positive reviews. Later that year Mitchell and Rice incorporated and capitalized SportsBand. Late in 1987, SportsBand and PGA entered into a trial term agreement under which SportsBand agreed to conduct three additional pilot broadcasts at its own expense because PGA refused to enter into a long-term agreement without such additional broadcasts. These pilots too received positive reviews.

In July 1988, the parties signed a long-term contract (the Agreement) under which SportsBand was licensed to conduct broadcasts at PGA events for a five-year term and was granted an option to renew for an additional five-year term. The Agreement specified that SportsBand was responsible for all technical production and operating expenses and that PGA was to "provide SportsBand with a list of all [PGA] advertising clients and Sponsors and be responsible for the sale of commercial units, features and vignettes to these clients and Sponsors." PGA would not, however, "guarantee any such sales, and the number actually sold during any year of the Term [would not] affect SportsBand's obligations to pay the guaranteed amounts set forth in Section 3.1 [rights fees]." With respect to other sponsors, PGA agreed to

3

"provide best effort support for SportsBand's sales efforts with appropriate assistance by [PGA] personnel, including but not limited to a letter of introduction and endorsement of SportsBand from the Commissioner . . . ."  As consideration, SportsBand undertook to pay PGA "rights fees" plus a share of the revenues. In addition, SportsBand agreed to indemnify PGA and hold it harmless from all losses, claims, damages and expenses incurred in connection with the rental, marketing, advertising, operation or promotion of the program.  Finally, the Agreement explicitly stated that no partnership or joint venture relationship existed between the parties.

The parties are in agreement that PGA, largely through Art West —— PGA's Director of Promotions and SportsBand's primary PGA contact —— undertook a marketing campaign to sell sponsorships of the broadcast program.  PGA especially pursued Nabisco, PGA's largest corporate client, to purchase a title sponsorship at a cost of $800,000.  Despite early interest, Nabisco informed PGA and SportsBand in May of 1988 that it would not purchase a title sponsorship.  Nevertheless, the evidence shows, PGA continued to solicit sponsorship funds from Nabisco and many other potential sponsors.[2]

Mitchell and Rice testified that by the end of 1988 they were becoming hesitant about proceeding with the 1989 broadcast season,

_____

[2]PGA was eventually successful in convincing Nabisco to sponsor SportsBand broadcasts at two tournaments in late 1988.

4

given the lack of confirmed sponsorship funds; in fact, they proposed pretermitting broadcasts for that season.  According to Mitchell and Rice, however, West convinced them to go forward with an ambitious twenty-tournament schedule, assuring them that several substantial sponsorships —— including Bell Systems, Nabisco, and Liberty Mutual —— were in the "final review" stages.  Mitchell and Rice also claim that West represented to them that PGA would cover SportsBand's expenses if they did not generate enough advertising and sponsorship money to cover such costs.  West told them that the most important thing was for SportsBand to go through with the 1989 season, as PGA had publicized the upcoming broadcasts to clients and the media.  West indicated that postponing the season was simply not an option.  Mitchell and Rice also aver that West instructed them not to market SportsBand independently, but to concentrate on producing the broadcasts.

To the astonishment of both parties, radio rentals at the 1989 tournaments fell far short of expectations.  The penetration rate[3] remained low, even after several promotions in which spectators were given receivers free of charge.  In May 1989, after nine tournaments, SportsBand, with PGA's consent, cut short the 1989 broadcast season for lack of funds.  Despite this setback, SportsBand hoped to recapitalize, and PGA continued to market

---

[3]Penetration refers to the ratio of spectators that purchase or use SportsBand's product compared with the total number of spectators who attend the tournament.

SportsBand for the 1990 season. The evidence shows that by late summer of 1989, however, SportsBand had let all its employees go, and by January 1, 1990, it had closed its offices. Furthermore, its efforts to recapitalize had been singularly unsuccessful.

SportsBand contends that it attempted to renegotiate certain provisions of the Agreement pursuant to § 22, which provides that "in the event the performance by SportsBand of its obligations . . . prove[s] to be economically disadvantageous to SportsBand when compared to the financial investment of SportsBand in the Service, [the parties] will negotiate in good faith for a readjustment of the percentage distribution of the 'remaining revenue' . . . ." SportsBand maintains that instead of renegotiating PGA sent SportsBand a letter in June 1990, stating that SportsBand owed PGA approximately $247,000, comprising the balance owed on minimum rights fees, various out-of-pocket expenses incurred by PGA for SportsBand, and the percentage of receiver revenues to which PGA was entitled. In November, PGA renewed its request for payment, this time seeking only $227,085.05, the largest component of which was $125,000 in rebates that PGA had remitted to the eight sponsors on SportsBand's behalf because of its failure to complete the twenty-broadcast schedule. The parties dispute whether this invoice was proper and whether SportsBand acknowledged that it owed this amount.

In any event, on February 21, 1990, PGA sent SportsBand a notice of default, declaring that unless full payment of the

6

balance due was made within ten days, the Agreement would terminate.  Over a month later, on March 26, PGA sent SportsBand a formal notice of termination.[4]

## B.  Proceedings

In December 1992, SportsBand, Mitchell, and Rice filed suit against PGA.  They filed their first amended complaint in October 1993, alleging breach of contract, breach of fiduciary duties, fraud, and constructive trust.  For their breach of contract claim, they asserted that PGA breached the Agreement by, inter alia, (1) not fulfilling its obligation to market and raise title and other sponsorships; (2) failing to purchase all sponsorship time that PGA was unable to sell; (3) failing to negotiate and agree on broadcast schedules; (4) failing to renegotiate contract terms; (5) wrongfully billing for unearned amounts; and (6) wrongfully terminating the Agreement.  Plaintiffs also alleged breach of fiduciary duties based on the same acts and omissions.

In addition, SportsBand, Mitchell, and Rice contended that PGA committed fraud by misrepresenting (1) that it would raise funds for SportsBand –– or if unable to obtain necessary sponsorships, provide funds –– if SportsBand undertook the extensive 1989 broadcast schedule demanded by PGA; (2) the nature and meaning of its commitment to and partnership with SportsBand; (3) that it

_____

[4]SportsBand alleges that PGA actually terminated the Agreement at a February 27 meeting of PGA's Policy Board and that this termination was wrongful as it failed to afford SportsBand the applicable cure period pursuant to § 13 of the Agreement.

7

would be a title sponsor; (4) that it would renegotiate the terms of the Agreement; and (5) that it would acquire SportsBand. Plaintiffs assert that these misrepresentations induced them to undertake the 1989 schedule and to perform other detrimental acts. SportsBand's constructive trust claim urged that to allow PGA to benefit from violating the five-year exclusivity provisions of the Agreement would be unjust. Finally, SportsBand sought pre- and post-judgment interest, costs and attorney's fees.

In October 1993, PGA filed its second amended answer and counterclaim, seeking damages from SportsBand for breach of contract and unjust enrichment, and from Mitchell and Rice individually as the alter-egos of SportsBand. PGA asserted that SportsBand materially breached the Agreement by, inter alia, failing to complete the 1989 broadcast schedule and wrongfully refusing to pay sums due PGA pursuant to the Agreement. PGA alternatively answered that SportsBand was unjustly enriched by retaining funds rightfully belonging to PGA.

Almost two years later, in August 1995, the district court entered an amended interlocutory judgment, dismissing with prejudice the following claims and remedies sought by SportsBand: (1) breach of alleged promises to provide financial support, to renegotiate the Agreement and to bring SportsBand in-house; (2) imposition of a constructive trust; (3) lost profits for 1994-1998; and (4) lost business opportunity. By separate interlocutory judgment, the district court dismissed with prejudice the

8

individual claims of Rice (but not those of Mitchell).

The case was tried to a jury in February 1996. After SportsBand completed the presentation of its case in chief, PGA moved for a j.m.l. The district court granted that motion in part, ruling that the trial could proceed on SportsBand's breach of contract claims as set out in the pretrial order but dismissing Mitchell's individual claims as a plaintiff and SportsBand's claims for breach of fiduciary duty,[5] implied partnership, and fraud. In dismissing the fraud claim, the court reasoned that:

> statements of opinion or belief or prediction of future events over which it's known that a person has no control cannot constitute the basis for a fraud claim. However, otherwise, statements of fact that proved to be untrue also cannot be the basis of a fraud claim unless there is some evidence that the person knew that the representation was false, should have known that it was false, or made the statement with reckless disregard of its truth or falsity.
>
> There is no evidence that Art West in making any such statements to the plaintiffs, if he did, made the statement under any of these circumstances.

Early the next month, SportsBand moved for a j.m.l. on its breach of contract claims and on PGA's counterclaim. Granting that motion in part, the court dismissed PGA's alter ego claims.

At the close of evidence, PGA filed a second motion for a j.m.l., which the district court denied, thereby allowing SportsBand's breach of contract claim to go to the jury. The jury rendered a verdict in favor of SportsBand, awarding it $979,000 in

---

[5]The district court determined that this claim was barred by the statute of limitations.

9

damages for breach of the Agreement, consisting of $579,000 for breach of the marketing provision and $400,000 for breach of the termination provision. The district court entered final judgment granting those sums, as well as post-judgment interest. Additionally, the final judgment confirmed the dismissal with prejudice of (1) SportsBand's claims of constructive trust, breach of fiduciary duties, implied partnership, and fraud; (2) all claims of Rice and Mitchell; and (3) PGA's alter ego claims.

PGA filed motions for a new trial and a j.m.l. SportsBand filed (1) a motion to amend the judgment to include pre-judgment interest and costs of court, and (2) a motion requesting attorney's fees. The court denied these motions. Then, in July 1996, the court granted PGA's j.m.l. motion, holding that, even though SportsBand had presented sufficient evidence to support the jury's verdict that the Agreement had been breached, SportsBand had "failed to present sufficient evidence to establish that they sustained damages that were proximately caused by any such breach." The court commented that no evidence was presented to support a finding that SportsBand would not have incurred its claimed operating and start-up expenses absent a breach. The court also observed that the contract expressly disclaimed any guarantee of profits, and, as the court had previously ruled, no fiduciary or partnership relationship existed. Thus, "the damages awarded by the jury were not based upon sufficient evidence, but rather conjecture and speculation." The court entered an amended final

judgment denying recovery by any of the parties and dismissing all claims with prejudice.

After its subsequent motions to set aside the amended judgment and for a new trial were denied, SportsBand timely appealed.[6]

## II

## ANALYSIS

### A. Breach of Contract

SportsBand asserts that the district court erred by overturning the verdict of the jury and granting a j.m.l. in favor of PGA, dismissing SportsBand's breach of contract claims. The parties agree that Texas law applies in this diversity action.

#### 1. Standard of Review

We review de novo rulings on a motion for a j.m.l., applying the same standard as that used by the trial court.[7] We do not disregard a jury's verdict lightly, and will uphold its findings if, "considering all of the evidence and all its reasonable inferences in the light most favorable to the winning party, . . . there is substantial evidence 'of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions.'"[8] A "mere scintilla"

---

[6]Mitchell is no longer a party to this appeal.

[7]Mosley v. Excel Corp, 109 F.3d 1006, 1008 (5th Cir. 1997); Gutierrez v. Excel Corp., 106 F.3d 683, 686 (5th Cir. 1997).

[8]Shipp v. General Motors Corp., 750 F.2d 418, 421 (5th Cir. 1985) (quoting Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.

11

of evidence, however, is insufficient to sustain a jury verdict.[9]

## 2. Marketing Provision

SportsBand contends that PGA breached the marketing provision, § 3.3.1, of the Agreement. Even assuming arguendo that there was a breach of this provision, however, we agree with the district court that SportsBand failed to prove that the financial losses it suffered were proximately caused by such breach. It is well-settled that a plaintiff must present competent evidence of the damages it claims.[10] This proof must consist of two elements: (1) proof of a causal connection between the injury sued on and the damages claimed;[11] and (2) proof of the amount of damages.[12] In this case, SportsBand failed to establish the first element of this test — the causal connection.

Our review of the record indicates that SportsBand did not

---

1969) (en banc)).

[9]Brady v. Houston Indep. Sch. Dist., 113 F.3d 1419, 1422 (5th Cir. 1997) (citing Boeing, 411 F.2d at 374).

[10]See Prunty v. Arkansas Freightways, Inc., 16 F.3d 649, 652 (5th Cir. 1994) ("It is truistic, indeed elementary, that one who seeks compensatory damages must present evidence of those damages.").

[11]Morgan v. Compugraphic Corp., 675 S.W.2d 729, 732-33 (Tex. 1984); Texas Indus., Inc. v. Vaughan, 919 S.W.2d 798, 801 (Tex. App. —— Houston [14th Dist.] 1996, writ denied); Beaumont v. Excavators & Constructors, Inc., 870 S.W.2d 123, 139 (Tex. App. —— Beaumont 1993, writ denied).

[12]Silor v. Romero, 868 F.2d 1419, 1422 (5th Cir. 1989); Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc., 814 S.W.2d 553, 556 (Tex. App. —— Houston [1st Dist.] 1991, no writ).

produce evidence that its lost revenue was caused by PGA's alleged marketing deficiencies or refusal to allow SportsBand to market independently. For instance, there was no testimony from potential sponsors who might have been willing to sponsor SportsBand if PGA or SportsBand had solicited them more or differently. In fact, the only third party witness offered by SportsBand was a Nabisco official who testified that PGA had marketed the SportsBand program aggressively and that the only impediment to Nabisco's purchasing a sponsorship was a leveraged buyout. Neither did SportsBand produce evidence that it suffered damage because PGA provided an introductory letter from the Deputy Commissioner instead of the Commissioner, as required by the Agreement. Indeed, Rice testified that to his knowledge SportsBand never even tried to use the letter for marketing purposes.

SportsBand attempts to show a proximate cause relationship between the breaches of the marketing provision and its damages by claiming that it would not have had to spend over $1 million of its operating capital if PGA had performed its duties under the Agreement. SportsBand asserts that it expended substantial resources in preparing to perform and performing under the Agreement, including producing the 1989 broadcast season. It insists that these expenditures were made in reasonable reliance on the Agreement and PGA's promise to perform its obligations thereunder. Citing Mistletoe Express Service of Oklahoma City v.

13

<u>Locke</u>,[13] SportsBand argues that once PGA breached the marketing provision these expenditures were converted to recoverable damages.

In <u>Mistletoe</u>, the court explained that under some circumstances, such as when a contract requires a capital infusion by one of the parties to perform, that party may recover its expenditures reasonably made in preparation for the contract when the other party breaches.[14] The court reasoned that, as the performing party will not have the entire contract term to recoup his investment, he must be able to recover these expenditures so as to be placed in a position no worse than the one he would have been in had the contract been performed.[15] The court noted that these "reliance" damages are an alternative to normal expectation damages[16]: "'[T]he injured party may, if he chooses, ignore the element of profit and recover as damages his expenditures in reliance.'"[17]

Albeit such "reliance" damages may be appropriate in some situations,[18] they are not available under the facts of this case.

---

[13]762 S.W.2d 637 (Tex. App. —— Texarkana 1988, no writ).

[14]<u>Id.</u> at 638.

[15]<u>Id.</u>

[16]<u>Id.</u> (citing Restatement (Second) of Contracts § 349 (1981)).

[17]<u>Id.</u> (quoting Restatement (Second) of Contracts § 349 comment a (1981)).

[18]<u>See, e.g.</u>, <u>City of Houston v. United Compost Servs., Inc.</u>, 477 S.W.2d 349, 355 (Tex. Civ. App. —— Houston [1st Dist.] 1972, writ ref'd n.r.e.).

Contrary to its assertions, SportsBand presented no evidence that it made expenditures in reliance on the Agreement; to the contrary, Rice and Mitchell repeatedly testified that, although they had no obligation under the Agreement to broadcast at all, they elected to fund the 1989 broadcast season based on West's alleged representations that sponsorships were pending or that PGA would underwrite SportsBand's expenses.[19] More importantly, SportsBand never pleaded the reliance theory of damages,[20] and in fact never asserted this basis for recovery until after its fraud claims were dismissed during the course of trial. The jury instructions —— to which SportsBand did not object and has not challenged on appeal[21] —— did not give the jury the choice to award reliance damages, but instead described only traditional "proximate cause" damages.[22]

---

[19]See infra Part II.B.

[20]See Nance v. Resolution Trust Corp., 803 S.W.2d 323, 330 (Tex. App. —— San Antonio 1990, writ denied).

[21]Any issues not raised or argued in SportsBand's brief are considered waived and will not be entertained on appeal. See United Paperworkers Int'l Union v. Champion Int'l Corp., 908 F.2d 1252, 1255 (5th Cir. 1990).

[22]The jury instructions provided, in pertinent part:

SportsBand contends that it suffered damages which were proximately caused by [PGA]'s breach of the terms of the July 13, 1988 Agreement. . . . The "proximate cause" is that cause which, in a natural and continuous sequence, produces an event, and without which such event would not have occurred. To be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result from that act or omission. . . . You may award compensatory damages only

SportsBand cannot now be heard to argue that damages should have been available under a different or additional theory. We thus conclude that the district court did not err in granting a j.m.l. in favor of PGA on this issue.

> 3. Termination Provision

SportsBand also contends that PGA breached § 13.0 (the termination provision) of the Agreement by (1) invoking the default provision based on an incorrectly calculated and improperly demanded invoice, and (2) failing to abide by the cure provisions set forth in the Agreement. Again, assuming arguendo that SportsBand established a breach of this provision, doing so provides no help because, like the district court, we discern no probative evidence that SportsBand's damages were proximately caused by this termination. What the evidence does show is that SportsBand had let all its employees go by late summer of 1989, and that by January 1, 1990, it had closed its offices. Furthermore, by that time SportsBand's efforts to recapitalize had failed. In short, SportsBand was defunct for several months before PGA ever purported to terminate the Agreement. SportsBand has shown no nexus between the breaches sued on and any damages it incurred. And, as previously discussed, SportsBand's contention that it should be able to recover its operating expenses as "reliance" damages is ineffectual. Thus, in the absence of evidence that

---

for injuries that SportsBand proves were proximately caused by [PGA]'s alleged breach of contract.

16

SportsBand suffered injury proximately caused by PGA's purported breach of the termination provision of the Agreement, we conclude that the district court did not err in granting a j.m.l. on that claim.

**B.    Fraud**

SportsBand next asserts that it advanced an actionable fraud claim in connection with West's alleged representations to Mitchell and Rice in December 1988 and January 1989 that (1) various sponsorships were in the "final review stages," and (2) if those sponsorships did not materialize, PGA would provide funding for the 1989 broadcast season.    Consequently, claims SportsBand, the district court erred when it granted PGA's motion for a j.m.l. on SportsBand's fraud claims at the end of SportsBand's case in chief, thereby preventing those claims from going to the jury.

1.  Standard of Review

Again, we review <u>de novo</u> rulings on a motion for a j.m.l.[23] Just as when we review a motion for a j.m.l. granted after the jury renders its verdict, when we review such a motion granted at the close of plaintiffs' case we must evaluate all the evidence "in the light and with all reasonable inferences most favorable to" the nonmovant — here, SportsBand.[24]  A motion for a j.m.l. at the close of a plaintiff's case should only be granted when "there is no

_____

[23]<u>Mosley</u>, 109 F.3d at 1008; <u>Gutierrez</u>, 106 F.3d at 686.

[24]<u>Boeing</u>, 411 F.2d at 374.

legally sufficient evidentiary basis for a reasonable jury to find for [the Plaintiff] on that issue . . . ."[25]

2. Applicable Law

Under Texas law, the elements of actionable fraud are "(1) that a material representation was made; (2) that it was false; (3) that, when the speaker made it, he knew it was false or made it recklessly without any knowledge of its truth and a positive assertion; (4) that he made it with the intention that it should be acted upon by the party; (5) that the party acted in reliance upon it; and (6) that he thereby suffered injury."[26] In its ruling, the district court noted first that statements of opinion or predictions of future events over which the declarant has no control cannot constitute the basis for a fraud claim. Even assuming that West's representations were untrue, concluded the court, there was no probative evidence that West knew or should have known that his statements were false or that he recklessly disregarded their falsity. As for West's alleged promise that PGA would fund SportsBand's 1989 broadcast season if sponsorships fell through, the district court found that there was no evidence that at the time he is alleged to have made this representation, West did not intend for that promise to be performed.

We find no error in the district court's ruling. SportsBand

---

[25]Fed. R. Civ. P. 50(a)(1).

[26]Walker v. FDIC, 970 F.2d 114, 122 (5th Cir. 1992)(citing Trentholm v. Ratcliff, 646 S.W.2d 927, 930 (Tex. 1983)).

18

urges that it adduced sufficient evidence to go to a jury on its fraud claim. SportsBand insists that West's representations about the status of negotiations for sponsorships were not offered as opinions but as statements of fact. SportsBand states repeatedly that West knew that funding was a major concern for SportsBand and that it would not have gone forward with the 1989 broadcast season had it known that PGA had misrepresented the status of funding. SportsBand contends that the fact that the sponsorships never materialized evidences West's intent to defraud SportsBand.

SportsBand's assertions simply do not satisfy all elements required to sustain a fraud claim. As the district court noted, SportsBand has presented no evidence that West knew or should have known that his statements regarding the potential sponsorships were false. In his January 10, 1989 letter to Rice which, according to SportsBand, memorialized West's representations, West specifically referred to three potential sponsors, stating that "we still have title sponsorship proposals in the final review stages by Nabisco ($500,000), Liberty Mutual ($250,000) and the Bell System ($250,000)."[27] West never asserted that the money had been or definitely would be collected, only that negotiations were in the final review stages. With regard to Nabisco, the evidence shows that West was indeed involved in ongoing negotiations with Nabisco and that, as recently as late 1988, Nabisco was still contemplating

---

[27]Trial Exhibit 317.

19

a sponsorship of $500,000; and that it was the unforeseeable leveraged buyout of Nabisco in early 1989 that scuttled these plans. Clearly, West had no knowledge that this eventuality was pending when he allegedly made these representations to SportsBand. And, even though neither Liberty Mutual nor Bell Systems purchased sponsorships, Liberty Mutual did purchase advertising with SportsBand worth $36,000. As was the case with Nabisco, no evidence in the record suggests that West knew, should have known, or recklessly disregarded the fact that Liberty Mutual and Bell Systems were not going to become sponsors.[28] Even though we agree with SportsBand that intent may be proved through circumstantial evidence,[29] this does not aid SportsBand: There is not even circumstantial evidence that West knew or should have known that his purported statements were false when made.

Neither does SportsBand's claim with respect to West's second alleged misrepresentation — that PGA would fund the 1989 season if sponsorships did not materialize — satisfy the elements of a valid

---

[28]SportsBand contends that a letter from West to Liberty Mutual, dated January 11, 1988 and proposing a smaller sponsorship package to Liberty Mutual than that described in the January 10 letter to Rice, provides circumstantial evidence that West knew that the deal was not in the "final review stages." See Trial Exhibit 1496. Our review of this document reveals, however, that it was formulated at the request of Liberty Mutual and was copied to Mitchell. This is not the stuff of a viable fraud claim.

[29]See Walker, 970 F.2d at 122; Thornbrough v. Columbus & Greenville R. Co., 760 F.2d 633, 641 (5th Cir. 1985), overruled on other grounds, St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993).

fraud claim. True, under Texas law a party can base a claim of actionable fraud on a promise of future performance.[30] But the plaintiff must prove that the defendant had a present intent not to perform in the future.[31] As subsequent failure to perform, standing alone, is not evidence of intent not to perform,[32] "'[s]light circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent.'"[33]

SportsBand contends that there is a surfeit of circumstantial evidence that PGA never intended to fund SportsBand. It maintains that, as West understood that SportsBand was reluctant to proceed without adequate funding, he knew that the promise of funding would be a powerful inducement for SportsBand to move forward with the 1989 season. SportsBand concludes that, in combination with PGA's subsequent failure to provide funding, there was sufficient circumstantial evidence of fraudulent intent for this issue to go to the jury. We disagree. Albeit PGA's desire for SportsBand to

_____

[30]Walker, 970 F.2d at 122.

[31]Schindler v. Austwell Farmers Coop., 841 S.W.2d 853, 854 (Tex. 1992).

[32]Barbouti v. Munden, 866 S.W.2d 288, 295-96 (Tex. App. —— Houston [14th Dist.] 1993, writ denied), overruled on other grounds, Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc., 1997 WL 378129 (Tex. July 9, 1997).

[33]Beijing Metals & Minerals v. American Bus. Ctr., 993 F.2d 1178, 1186 (5th Cir. 1993) (quoting Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 435 (Tex. 1986)).

21

embark on the 1989 season may be circumstantial evidence of its intent to induce SportsBand to proceed, evidence of that desire does not prove that West had no intention of performing his promise at the time that he made it. Without evidence of such contemporary intention, SportsBand cannot sustain a claim for the breach of a promise of future performance. We conclude that the district court did not err in granting PGA's motion for a j.m.l. on SportsBand's fraud claims.

## C.    **Lost Profits**

SportsBand contends that the district court erred when it excluded the testimony of Ted Griffith —— SportsBand's expert witness on lost profits —— and then rejected SportsBand's lost profits claim altogether.

### 1.    Standard of Review

We review a district court's evidentiary rulings for abuse of discretion.[34]  District courts are granted wide latitude in determining the admissibility of expert testimony, and "the discretion of the trial judge and his or her decision will not be disturbed on appeal unless 'manifestly erroneous.'"[35]  The district court did not cite Rule 50 of the Federal Rules of Civil Procedure when it excluded SportsBand's claim for lost profits. But inasmuch

---

[34]General Elec. Co. v. Joiner, 118 S. Ct. 512, 517 (1997).

[35]Watkins v. Telsmith, Inc., 121 F.3d 984, 988 (5th Cir. 1997) (quoting Eiland v. Westinghouse Elec., 58 F.3d 176, 180 (5th Cir. 1995)).

22

as the court did dispose of that claim, we view its ruling as a grant of a motion for a j.m.l.[36]   Our review of the ruling is therefore <u>de novo</u>.[37]

  2.   <u>Applicable Law</u>

Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto . . . ."[38] The Advisory Committee Notes to Rule 702 explain that "[w]hen opinions are excluded, it is because they are unhelpful and therefore superfluous and a waste of time."[39]

In excluding Griffith's testimony, the district court stated that "it is questionable whether this witness has any expertise that would assist the jury in making any calculation of lost profit . . . ."   The court noted that Griffith, in making his calculations, "simply at random selected figures . . . in evidence in the case" and "selected those figures which would support the

_____

[36]The district court may "direct the verdict" or grant a "motion for judgment" <u>sua sponte</u>. <u>See, e.g.</u>, <u>Christopher W. v. Portsmouth Sch. Comm.</u>, 877 F.2d 1089, 1092-93 (1st Cir. 1989); <u>Insigna v. LaBella</u>, 845 F.2d 249, 251 (11th Cir. 1988).

[37]<u>Mosley</u>, 109 F.3d at 1008; <u>Gutierrez</u>, 106 F.3d at 686.

[38]Fed. R. Evid. 702 (1997).

[39]Adv. Comm. Note to Fed. R. Evid. 702 (citing 7 Wigmore § 1918).

plaintiffs' claim . . . but without any research into whether the figures were valid . . . [or] whether any experts in this field . . . would have used the same figures." The court noted, for instance, that Griffith's sponsorship revenue figures assumed that SportsBand would operate at twenty tournaments per year; SportsBand contended throughout the litigation, however, that the twenty-event figure was merely a goal. Likewise, Griffith acknowledged that SportsBand would have to change its marketing strategy substantially to achieve his projected 50 percent penetration ratio, most likely by including SportsBand receivers in the ticket package of the event. As the district court pointed out, though, even Griffith conceded that such a strategy would require the approval of the individual event organizers, who were not likely to view the concomitant increase in ticket prices with favor. Moreover, the court determined that there was no evidence that Griffith's methodology had been authoritatively expressed by other proclaimed experts in the field or that his methodology had been submitted to peer review. The court concluded that "Griffith's model for lost profits is based on assumptions which are so speculative that his testimony would be irrelevant and would not materially assist the trier of fact."

SportsBand nevertheless insists that the district court abused its discretion in excluding Griffith's testimony as speculative. It contends that Griffith's figures were based on objective data and that his methodology was of the type reasonably relied on by

24

experts in his field. SportsBand asserts that Griffith's practical experience — including his work with sports-related companies, his involvement in sponsorship and marketing activities for sporting events, and his responsibilities as a marketing director for a sports association — qualified his as an expert.[40] Further, SportsBand maintains that the district court's criticism is directed at the "bases and sources" of Griffith's opinions, which SportsBand urges "affect the weight to be assigned [to the] opinion rather than its admissibility and should be left for the jury's consideration."[41] Finally, SportsBand submits that the district court improperly used its gatekeeper role to replace the adversary system by supporting its finding with perceived flaws in Griffith's testimony; in other words, SportsBand argues that the jury should have been given the opportunity to consider and weigh the evidence.

In response, PGA asserts first that Griffith lacked the necessary qualifications to express an expert opinion regarding SportsBand's lost profits. PGA notes that Griffith does not possess a college degree or any sort of business or marketing certification or degree, and that he has never sold advertising at any golf tournament in either the United States or Canada, or at

---

[40]See Rogers v. Raymark Ind., 922 F.2d 1426, 1429 (9th Cir. 1991).

[41]Christophersen v. Allied-Signal Corp., 939 F.2d 1106, 1109 (5th Cir. 1991), cert. denied, 503 U.S. 912 (1992) (en banc) (quoting Viterbo v. Dow Chem., 826 F.2d 420, 422 (5th Cir. 1987)), overruled on other grounds, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 587 n.5 (1993).

any other sporting event in the United States. Griffith's sole involvement with SportsBand was one failed attempt to interest a Canadian company in sponsoring a single SportsBand broadcast in Canada. More importantly, PGA maintains that the facts on which Griffith's opinions were based were merely "optimistic hypotheticals as to penetration rate, receiver rental income, sponsorship revenues and number of tournaments." Finally, PGA contends that Griffith's methodology was flawed given that (1) he neither tied SportsBand's alleged lost profits to any misconduct on the part of PGA nor factored in SportsBand's own role,[42] and (2) he failed to consider two other entities in the same or similar business as SportsBand.

We do not perceive anything approaching abuse of discretion in the district court's evidentiary ruling. After a thorough review of Griffith's testimony, the court concluded that "Griffith failed to conduct adequate research, failed to consider certain historical data and failed to establish that his methodology was accepted." Although we agree with SportsBand that as a general rule any shortcomings in an expert's testimony related to the "bases and sources of his opinions" should affect the weight to be given the testimony rather than its admissibility,[43] we have also noted that

---

[42]See Viterbo, 826 F.2d at 423-24 (holding that testimony that failed to attribute harm to defendant's alleged misconduct, and that acknowledged that plaintiff's ills might have a number of causes, was properly excluded).

[43]Christophersen, 939 F.2d at 1109.

"[i]n some cases . . . , the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion."[44]  We are satisfied that here the district court did not abuse its considerable discretion when it determined that Griffith's testimony was so speculative that it would not aid the jury in this case.[45]

Having excluded the testimony of SportsBand's expert witness on lost profits, the district court rejected SportsBand's lost profits claim altogether.  In so doing, the court reasoned that to recover for lost profits under Texas law, a plaintiff must produce sufficient evidence to enable the jury to determine the net amount of lost profits with reasonable certainty.[46]  It is not necessary that the lost profits be subject to exact calculation;[47] still, estimates of lost profits must be based on objective facts, figures or data from which the amount of lost profits can be ascertained

---

[44]Viterbo, 826 F.2d at 422;  see also Berry v. Armstrong Rubber Co., 989 F.2d 822, 824 (5th Cir. 1993), cert. denied, 510 U.S. 1117 (1994) ("If the basis for an expert's opinion is so unreliable that no reasonable expert could base an opinion on that data, the opinion may be excluded....").

[45]In another evidentiary ruling, the district court excluded SportsBand's evidence of pre-December 1988 damages.  Despite SportsBand's urgings, we perceive no abuse of discretion in this ruling.

[46]See White v. Southwestern Bell Tel. Co., 651 S.W.2d 260, 262 (Tex. 1983).

[47]Frank Hall & Co. v. Beach, Inc., 733 S.W.2d 251, 258 (Tex. App. — Corpus Christi 1987, writ ref'd n.r.e.).

with reasonable certainty.[48]  The district court concluded that SportsBand's evidence —— including the testimony of Griffith —— was too speculative to serve as the basis of a lost profits claim. This conclusion was bolstered by the fact that the Agreement, "although setting out a formula for distribution of revenues . . . , does not guarantee any level of profit to the plaintiffs . . . ."

Undaunted, SportsBand contends on appeal that it adduced sufficient evidence for the jury to find that it was entitled to lost profits.  It asserts that, under Texas law, the recovery of lost profits is not entirely dependent on whether the plaintiff was a new or established concern at the time of the defendant's breach.[49]  Further, SportsBand maintains that the fact that it had never earned a profit prior to PGA's alleged wrongful conduct is not conclusive;[50] instead, when there is no profit history, the viability of a lost profits claim depends on whether there is sufficient evidence to prove lost profits with reasonable

---

[48]Id.

[49]See, e.g., Pace Corp. v. Jackson, 284 S.W.2d 340, 343, 348 (Tex. 1955) (awarding lost profits to companies that were only several weeks old at the time of defendant's breach); Allied Bank West Loop, N.A. v. C.B.D. & Assocs., 728 S.W.2d 49, 54 (Tex. App. —— Houston [1st Dist.] 1987, writ ref'd n.r.e.) (holding that business that was only months old when it was forced to close could recover lost profits).

[50]See Hiller v. Manufacturers Prod. Research Group, 59 F.3d 1514, 1520-21 (5th Cir. 1995); Orchid Software, Inc. v. Prentice-Hall, Inc., 804 S.W.2d 208, 211 (Tex. App. —— Austin 1991, writ denied) ("[T]he absence of a history of profits does not, by itself, preclude a new business from recovering lost future profits.").

certainty.[51]   SportsBand insists that its evidence meets this standard, as (1) SportsBand's financial projections demonstrated profits of over $4 million; (2) these projections were based on objective facts, figures, and data; (3) PGA itself projected significant revenue from SportsBand; and (4) determining lost profits would involve a simple calculation based on the revenue and expense figures.  Finally, SportsBand notes that the presence of a contractual guarantee of profit is not a prerequisite to recovering for lost profits.

Predictably, PGA counters that the district court properly excluded SportsBand's claim for lost profits, as SportsBand's lost profits model was based on pure speculation.  PGA maintains that the speculative nature of SportsBand's figures is evidenced by the fact that SportsBand generated a cumulative loss of almost $3 million, in sharp contrast to its projected $4 million in future profits.  According to PGA, SportsBand attracted neither the usage rates nor the sponsorships desired; its lost profits model was based on financial projections of what SportsBand — and PGA for that matter — had <u>hoped</u> SportsBand would achieve.

PGA concedes that, in an appropriate case, a claim for lost profits could be founded on financial projections.  In <u>Goldman v. Alkek</u>,[52] for example, the court held that, when a qualified expert

---

[51]<u>Texas Instruments, Inc. v. Teltron Energy Mgt., Inc.</u>, 877 S.W.2d 276, 280 (Tex. 1994); <u>Orchid Software</u>, 804 S.W.2d at 210.

[52]850 S.W.2d 568 (Tex. App. — Corpus Christi 1995, no writ).

29

estimated the plaintiff's lost profits based on his own sales to the plaintiff, information provided by the plaintiff about his actual historical sales, and the expert's nine years experience, there was "legally sufficient evidence of lost profits based on objective facts, figures, or data."[53]  PGA maintains, however, that the certainty of SportsBand's data falls far short of that in Goldman.  Moreover, PGA posits that the fact that it was initially as optimistic as SportsBand about the opportunity for financial gain does not convert SportsBand's projections into the objective facts required to support an award of lost profits.[54]  Finally, PGA insists that the district court did not rely solely on the lack of a contractual provision guaranteeing profits, but instead viewed it as but one factor illustrating the speculative nature of SportsBand's figures.

We agree with PGA and the district court that SportsBand's projections are too speculative to serve as a basis for a lost profits claim.  As the district court pointed out, those Texas cases holding that new businesses or businesses that have never earned a profit are not precluded from recouping lost profits[55] do

_____

[53]Id. at 575.

[54]See Texas Instruments, 877 S.W.2d at 280 ("Teletron strenuously argues that even TI thought its projections were reasonable.  The fact that TI shared Teletron's hopes adds no substance to them.").

[55]See, e.g., Pace, 284 S.W.2d at 348; Thedford v. Missouri Pacific R. Co., 929 S.W.2d 39, 48-9 (Tex. App. —— Corpus Christi 1996, writ denied).

not stand for the principle that damages for lost profits should be allowed as a matter of course for every start-up business involved in a contract dispute. There must be some objective basis for calculating lost profits with reasonable certainty. As the Texas Supreme Court has explained, "[p]rofits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a new and unproven enterprise, cannot be recovered."[56] In our estimation, SportsBand was both a "chancy business opportunity" and an "unproven enterprise," and SportsBand produced insufficient evidence to support a lost profits claim with reasonable certainty —— especially after the district court excluded Griffith's expert testimony. Our <u>de novo</u> review of the record satisfies us that the district court did not err reversibly in excluding SportsBand's claim for lost profits.

## D. Interest, Attorney's Fees, and Costs

Given our conclusion that the district court did not err in overturning the jury verdict, SportsBand's claim that the district court also erred in rejecting SportsBand's motion for interest, attorney's fees, and costs evanesces. Further consideration of this claim is unnecessary.

**III**

---

[56]<u>Texas Instruments</u>, 877 S.W.2d at 279.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is, in all respects,

AFFIRMED.