# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 29, 2010

No. 08-51119

Charles R. Fulbruge III
Clerk

WINIFRED WACKMAN; JANICE KELLOGG; JESSICA CLARK; JOSEPH GRADY CLARK,

Plaintiffs - Appellees

v.

PATRICIA ANN RUBSAMEN,

Defendant - Appellant

---

Appeal from the United States District Court
for the Western District of Texas

---

Before WIENER, GARZA, and ELROD, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendant Patricia Ann Rubsamen ("Rubsamen") appeals the district court's denial of her motion for judgment as a matter of law or, in the alternative, for a new trial. The jury found Rubsamen liable for wrongful death, conspiracy, tortious interference with inheritance, and undue influence and awarded past and future mental anguish damages, exemplary damages, and damages for both tortious interference and undue influence.

## I

Carolyn Clark ("Carolyn"), an 82-year-old cancer patient, died at home in hospice care. Plaintiffs-Appellees, Winifred Wackman ("Winifred"), Janice

No. 08-51119

Kellogg ("Janice"), and Jessica Clark ("Jessica"), Carolyn's daughters, brought Texas-law claims for wrongful death and conspiracy against Rubsamen, Carolyn's live-in caretaker, and Billy Frank Peters ("Peters"), a high-school friend of Rubsamen's who assisted in Carolyn's care. Joseph Grady Clark ("Joey"), one of Carolyn's grandsons, brought claims for tortious interference with inheritance and undue influence with respect to certain trust documents that Carolyn executed.

Although Carolyn apparently had a close relationship with Joey, her relations with her daughters were, by all accounts, strained and contentious. In the early 1990s, Carolyn and her husband left Houston, where their daughters lived, and moved to Alpine, TX to be closer to Carolyn's sister, Virginia Haynes ("Virginia"). Shortly after relocating, Carolyn and Virginia built the "Las Brisas house," their 8,500-square-foot dream retirement home. Carolyn's decision to move to Alpine was not popular with her daughters, who had been accustomed to regular visits with their father. The distance put further strain on relations between mother and daughters.

In 1995, Carolyn's husband died. The daughters attended their father's funeral but did not sit with their mother. Winifred and Janice spoke with Carolyn at the funeral but then had no further contact for the remainder of Carolyn's life. Jessica likewise never saw Carolyn after her father's funeral. However, she did make at least some attempt to visit Carolyn before her death. Joey maintained his relationship with Carolyn through occasional telephone calls, but did not visit her after 1998.

There is no dispute that discord existed between Carolyn and her daughters. Each of the daughters acknowledged that Carolyn had disinherited them as well as her grandchildren, with the exception of Joey, who was to be Carolyn's heir.

2

No. 08-51119

Rubsamen first met Carolyn in the late 1970s through Winifred. Rubsamen regularly spent time with Carolyn after moving to Houston in the early 1980s. She maintained her relationship with Carolyn after Carolyn relocated to Alpine. After Joseph's death, Rubsamen visited more frequently and the women took trips together. At some point in mid-2003, Rubsamen moved from Vermont to Texas to take care of Carolyn and Virginia, preparing meals and spending time with the women as needed, because neither of them was in good health. Eventually, Rubsamen moved in with the sisters while her husband lived at the home they had purchased in Alpine. Although Rubsamen's husband suffered from emphysema and other health problems, Rubsamen spent a great deal of time taking care of Carolyn and Virginia, while entrusting the care of her husband to others. Rubsamen's high school friend, Peters, also moved in to assist in care-taking and to act as a "bodyguard."

Carolyn was initially diagnosed with breast cancer in 1994, and then later with recurrent metastatic breast cancer. She suffered great pain from the metastases and took a potent mix of narcotic painkillers.[1] Dr. Darrell Parsons, Carolyn's regular physician from October 2000 until her death, characterized her cancer as progressing "steadily." At his last visit with her on May 6, 2005, Dr. Parson's notes reflect that they discussed "end-of-life issues." He testified that Carolyn was "experiencing the dying process" and that she knew and acknowledged that fact. She had declined further treatments and follow-up appointments with her oncologists. Dr. Parsons offered hospice care, available to patients that are classified as having six months or less to live, but Carolyn turned it down. Rubsamen, also present at the appointment, agreed that she could handle Carolyn's care.

---

[1] Her medications included Darvocet, a mild narcotic pain reliever; MSContin, an extended release morphine drug; and later, OxyContin, another narcotic morphine-like drug.

No. 08-51119

A few days later, Rubsamen called Dr. Parsons back and asked for hospice. Diane Hendrus, a hospice care nurse, went to Carolyn's house to evaluate the situation. Hendrus found Carolyn in quite a bit of pain and called Dr. Parsons for a prescription. At Hendrus's suggestion, Dr. Parsons prescribed Roxanol, a fast-acting liquid form of morphine that was intended to ease breakthrough pain. The prescription was for 120 milliliters, to be given in doses of ½ to 1 milliliter every 30 minutes as needed. Carolyn was in hospice from May 13 until her death, at home, on May 19. The only people present when she died were Rubsamen and Peters.

Carolyn's death certificate, signed by Dr. Parsons, listed cause of death as metastatic breast cancer. At the daughters' request, an autopsy was performed, although not until after Carolyn's body had been embalmed. The doctor who did the autopsy, Dr. Corinne Stern, concluded that Carolyn died as a result of metastatic cancer. Carolyn's daughters hired Dr. Sridhar Natarajan to review the autopsy findings and laboratory tests. Dr. Natarajan disagreed with Dr. Stern's conclusions because he found 3.1 mg/KG of free morphine in Carolyn's liver tissue, which he believed indicated acute morphine intoxication. He ruled out all other possible causes of death, including metastatic cancer, and testified that he believed that cause of death was acute narcotic intoxication.

After Carolyn's death, Rubsamen controlled all of Carolyn's substantial estate through an intricate network of trusts and a partnership. Carolyn's daughters and her grandson, Joey, brought the instant suit. The jury unanimously returned a verdict favorable to Plaintiffs-Appellees, finding that Rubsamen and Peters caused Carolyn's death and that they conspired to do so. The jury awarded $250,000 each to Winifred, Janice, and Jessica for mental anguish suffered in the past; $50,000 each to Janice and Jessica for future mental anguish; and $75,000 to Winifred for future mental anguish. Exemplary damages were tried to the court upon the jury's finding of gross negligence and

4

the district court awarded $750,000 in exemplary damages to be divided equally among the daughters. The jury also found that Rubsamen tortiously interfered with Joey's inheritance and awarded $3 million in damages. Finally, the jury found that Rubsamen exerted undue influence with respect to certain trust documents, and the jury awarded $2 million on that claim.

Rubsamen filed a motion for judgment as a matter of law (or, in the alternative, for a new trial) challenging the sufficiency of the evidence to support, *inter alia*, the jury's findings that she caused Carolyn's death, as well as the findings of conspiracy, undue influence, tortious interference with inheritance, and damages. The district court denied Rubsamen's motion and entered a final judgment on the jury award, with the exception of the $2 million damage award for undue influence. Rubsamen now appeals.

## II

"We review *de novo* the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 481 (5th Cir. 2008) (citation omitted). A Rule 50 motion after a jury trial is a challenge to the legal sufficiency of the evidence. "[A] jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 481–82 (internal quotation marks and citation omitted); *see* FED. R. CIV. P. 50(a)(1). In reviewing the sufficiency of the evidence, this court "draw[s] all reasonable inferences and resolve[s] all credibility determinations in the light most favorable to the nonmoving party." *Travelers Cas.*, 542 F.3d at 482 (internal quotation marks and citation omitted). A motion for judgment as a matter of law "should be granted only if the facts and inferences point so strongly and overwhelmingly in favor of one party that the [c]ourt believes that reasonable men could not arrive at a contrary verdict." *McBeth v. Carpenter*, 565 F.3d 171, 176 (5th Cir. 2009) (citation omitted). "A jury may draw reasonable

inferences from the evidence, and those inferences may constitute sufficient proof to support a verdict." *Id.* (citation omitted).

Because "[o]ur review of the district court's denial of a motion for a new trial is more deferential than our review of a motion for judgment as a matter of law," any such challenge is subsumed in our analysis of the denial of a motion for judgment as a matter of law. *Travelers Cas.*, 542 F.3d at 482 (internal quotation marks and citation omitted).

## III

Rubsamen contends that there was insufficient evidence to support the jury's finding that she caused Carolyn's death by morphine poisoning. Specifically, Rubsamen argues that: (1) there is no legally competent evidence that Carolyn died of a morphine overdose; and (2) there is no evidence that Rubsamen administered a *lethal* dose of morphine. Rather, Rubsamen argues that the evidence overwhelmingly establishes that Carolyn died of metastatic breast cancer.

## A

This court applies federal standards of review to assess whether the evidence is sufficient to support a jury's verdict. *Hamburger v. State Farm Mut. Auto. Ins. Co.*, 361 F.3d 875, 884 (5th Cir. 2004). Nonetheless, a federal court sitting in diversity, as we are here, must "refer to state law for the kind of evidence that must be produced to support a verdict."[2] *Id.* (internal quotation

---

[2] Based on this general statement, Rubsamen posits that this court should look to Texas law to determine whether Dr. Natarajan's expert opinion is sufficiently reliable and supported to constitute "competent" evidence at all. Rubsamen misinterprets the rule laid down in *Hamburger*. Federal courts look to state law only to determine the general *kind* of evidence necessary to establish a particular state law cause of action. *See Hamburger*, 361 F.3d at 884 (looking to state law to determine whether expert testimony is necessary to establish the element of causation); *Ayres v. Sears, Roebuck & Co.*, 789 F.2d 1173, 1175 (5th Cir. 1986) (looking to state law to determine whether proof of a product defect could be established by circumstantial or anecdotal evidence), *abrogated on other grounds by Torres v. Oakland Scavenger Co.*, 487 U.S. 312 (1988). Admissibility, competency, and reliability of a particular expert's testimony are governed by federal standards. *See Guile v. United States*, 422 F.3d

marks and citation omitted).  Under Texas law, a plaintiff must establish by a preponderance of the evidence that an act of the defendant caused the individual's death.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 71.002(b); *Christus St. Mary Hosp. v. O'Banion*, 227 S.W.3d 868, 874 (Tex. App.—Beaumont 2007, no pet.).  "[T]he plaintiff must establish a causal connection beyond the point of conjecture; proof of mere possibilities will not support the submission of an issue to the jury."  *O'Banion*, 227 S.W. 3d at 874 (alteration in original) (internal quotation marks omitted) (quoting *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988)).  In a wrongful death action, a plaintiff "generally must provide expert testimony to prove that the alleged . . . negligence proximately caused the injury."  *Id.*  Furthermore, a plaintiff must rule out other plausible causes of the injury.  *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 720 (Tex. 1997).  "There need not, however, be direct and positive proof, as the jury may infer proximate cause from the circumstances surrounding the event."  *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997) (internal quotation marks and citation omitted) (applying Texas law); *see also Havner v. E-Z Mart Stores, Inc.*, 825 S.W.2d 456, 459 (Tex. 1992) ("Nor 'need [causation] be supported by direct evidence, as circumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation.'" (alteration in original) (citation omitted)).

With this framework in mind, we must determine whether there is a "legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Travelers Cas.*, 542 F.3d at 481–82.  In reviewing challenges to expert testimony in the sufficiency context, federal courts must be mindful that "evidence sufficient to support a jury verdict must be *substantial* evidence."  *Guile*, 422

---

221, 226–27 (5th Cir. 2005) (applying federal standards to the reliability of an expert's opinion); *Garwood v. Int'l Paper Co.*, 666 F.2d 217, 223 (5th Cir. 1982) ("Even in a diversity case, the Federal Rules of Evidence govern the admissibility of evidence.").  Rubsamen has not appealed the district court's decision to admit Dr. Natarajan's testimony.

No. 08-51119

F.3d at 226. "An expert's opinion must be supported to provide substantial evidence; we look to the basis of the expert's opinion, and not the bare opinion alone." *Id.* (internal quotation marks and citation omitted).

## B

It is undisputed that Carolyn was prescribed Roxanol (a morphine-based drug) for pain, and that Rubsamen administered some quantity of the drug to Carolyn during her final week.[3]   Unfortunately, because Carolyn's body was embalmed shortly after her death, there was no contemporaneous toxicology report measuring the morphine levels in Carolyn's blood at the time of her death. Both sides presented expert testimony from doctors as to the likely cause of death. Rubsamen presented testimony from Carolyn's personal physician and the doctor who performed the initial autopsy, both of whom opined that she died of cancer. The Plaintiffs-Appellees presented the testimony of Dr. Natarajan, a forensic pathologist who reviewed the autopsy and medical records in the case. Dr. Natarajan opined that, based on elevated morphine levels derived from Carolyn's embalmed liver, the likely cause of death was morphine poisoning. Plaintiffs-Appellees also presented circumstantial evidence in support of their wrongful death claim.

---

[3] At the time of Carolyn's death, 94 milliliters remained in the Roxanol bottle, meaning that approximately 26 milliliters had been used during the six-day period from when it was prescribed until Carolyn died. Rubsamen objects for the first time on appeal to the testimony of one of the hospice nurses, equating ounces and milliliters as equivalent volumes. The nurse testified that she destroyed "94 cc's, 94 ounces, the same thing." Cubic centimeters (cc) and milliliters are the same measurement, but neither is equivalent to ounces. Rubsamen's counsel made no objection to the testimony, did not correct this testimony on cross-examination, and did not object during closing when Plaintiffs-Appellees' counsel stated that Carolyn had been given 26 ounces of Roxanol. To the extent that Rubsamen now objects to this testimony, our review is limited to plain error. *See Foradori v. Harris*, 523 F.3d 477, 508 (5th Cir. 2008). We conclude that Rubsamen cannot meet this standard. Although the testimony equating milliliters/cubic centimeters with ounces was incorrect, Rubsamen has not demonstrated that any alleged error affected her substantial rights. There was ample other evidence that the Roxanol prescription was in milliliters, not ounces, and the Plaintiffs-Appellees' expert witness based his testimony on the correct quantities of Roxanol. Even without the incorrect testimony of one person, the jury's verdict was supported.

No. 08-51119

According to Rubsamen, Dr. Natarajan's expert opinion was "baseless" because it lacked a reliable foundation. Rubsamen argues that the opinion is fatally flawed because it compares morphine levels in Carolyn's embalmed liver tissue with morphine levels in liver tissue that was not embalmed but rather was preserved in a substance called formalin. Dr. Natarajan testified that, based on his review of certain studies and treatises, morphine levels taken from a preserved liver were reliable. But Rubsamen contends that the studies used for this crucial premise involved formalin-preserved livers—*not* livers preserved in the standard funeral home embalming fluid used to embalm Carolyn's body, which is different than formalin. According to Rubsamen, no scientific literature indicates that livers preserved in standard embalming fluid can be reliably measured for morphine levels at the time of death. Moreover, Rubsamen contends that the primary study relied upon by Dr. Natarajan involved an "opiate-naive" patient, that is, a person not previously exposed to opiate-based drugs such as morphine, whereas Carolyn had been prescribed such drugs for years. Rubsamen points to testimony that there is no definitive "lethal dose" of morphine and that patients on chronic narcotic pain medication can safely tolerate levels of morphine that would kill a person who was morphine-naive. According to Rubsamen, these two "analytical gaps" in Dr. Natarajan's testimony rendered his opinion "incompetent" or "no evidence" at all, and thus the evidence was insufficient as a matter of law.

At the outset, we note that Rubsamen's complaints about Dr. Natarajan's opinion have some legitimacy: In determining that the elevated morphine levels in Carolyn's preserved liver were reliable, Dr. Natarajan relied substantially on scientific literature indicating that morphine levels could be obtained from tissue preserved in formalin. Formalin, while similar to standard embalming fluid, is technically distinct. Carolyn's tissues were not preserved in straight formalin. The funeral home director in this case testified that formalin is used primarily

9

in laboratory studies, not in funeral home embalming. Moreover, it is also true that the main study relied upon by Dr. Natarajan involved an opiate-naive patient. Nonetheless, having reviewed the bases of Dr. Natarajan's opinion, we reject Rubsamen's contention that the foundation of his opinion is so flawed or unreliable that it constitutes no evidence at all.

First, Dr. Natarajan himself acknowledged the "analytical gaps" between some of his source literature and the instant case. Dr. Natarajan looked at the toxicology report from Carolyn's autopsy which reported the level of "free morphine" present in embalmed liver tissue from her body. He then compared that value to blood levels of morphine in deaths known to be the result of morphine poisoning. At his *Daubert* hearing, Dr. Natarajan testified based on scientific literature that morphine levels could be reliably tested in embalmed liver tissue. He further testified that according to an authoritative drug pathology text, formalin embalming does not interfere with morphine extraction and testing, although formalin causes morphine to diffuse from the tissue into the fixative solution such that the post-storage morphine levels in liver samples were decreased by approximately twenty-five percent. Absolutely no evidence was adduced that embalming, whether in formalin or some other substance, might make morphine levels unreliable by causing them to appear *higher* than they really were. Rather, the evidence indicated that morphine might be destroyed or diffused out of the tissue in the embalming process such that the toxicology results would have reported *lower* levels than actually present.

At trial, Dr. Natarajan acknowledged that formalin and embalming fluid are not the same:

> [F]ormalin is a fluid that you would try to preserve a body in. And the embalming fluid is a type of formalin. It won't specifically be formalin. And also for that reason, I spoke with the laboratory directors regarding that, and both the literature as well as Karch's Textbook on Pathology of Drugs indicates that quantitative values from embalmed tissue can be utilized to determine actual values.

No. 08-51119

Rubsamen offered rebuttal testimony from Dr. Randy Frost, a forensic pathologist, who stated that he "believe[d] the formalin probably does make the liver morphine stable," but noted that Carolyn's body was embalmed, not preserved in formalin. Dr. Frost further testified that "just because something is true for formalin doesn't necessarily mean it's true for embalmed tissue."

The jury could reasonably have concluded that the formalin/embalming fluid distinction was not significant with regard to the reliability of the morphine level. The jury could have credited Dr. Natarajan's statement that "embalming fluid is a type of formalin" over the funeral director's testimony which implied, but never elucidated, a material distinction between the chemicals. Moreover, in describing the study on which he relied, Dr. Natarajan explained that it involved a woman who died, was embalmed, buried, then exhumed so that morphine levels in her *embalmed* liver could be analyzed.[4] The value of morphine in that woman's liver was 1.5 mg/KG which was several times higher than blood levels of morphine from known morphine deaths. Thus, the jury could have inferred that the process Dr. Natarajan used to compare embalmed tissue from Carolyn's body to blood values was similar, if not identical, to the process reported in the study. *See Havner*, 953 S.W.2d at 720.

Dr. Natarajan also acknowledged that the study involved persons who were opiate-naive. But that fact did not affect his opinion because Carolyn's liver showed an extremely high level of morphine—3.1 mg/KG. That level, when compared to reported blood levels of morphine in known morphine poisoning cases, was fourteen times higher. It was also more than twice the level found in

---

[4] The trial evidence did not indicate one way or the other whether the subject of the study was embalmed in formalin or embalming fluid. Given the conflicting testimony about the differences between formalin and embalming fluid and whether formalin or a formalin-type fluid is used in embalming, we find that the jury could have reasonably concluded that there was no material distinction between the embalming chemicals used in the subject of the study and those used to embalm Carolyn's body.

11

the embalmed tissue taken from the woman who was the subject of the study cited by Dr. Natarajan.  He testified that to a "reasonable degree of medical certainty" Carolyn's death was more likely than not attributable to acute narcotic intoxication.

Second, Dr. Natarajan's expert opinion was based on more than just the morphine levels.  Dr. Natarajan testified that he reviewed Carolyn's autopsy report and medical records to rule out other causes of death.  *See Havner*, 953 S.W.2d at 720.  In particular, he stated that "where someone is dying of cancer, the autopsy should show findings that will conclusively prove that that was the reason why the individual died."  Based on his review, Dr. Natarajan found such conclusive evidence lacking.  Dr. Natarajan stated that one would expect to see significant "derangement" of vital organs in a case where cancer was ruled the cause of death.  But Carolyn's cancer had not caused "derangement" to any internal system that would have been likely to cause death.  Dr. Natarajan also noted that while metastatic cancer was "studded" on the surfaces of various organs, no organs showed evidence of invasive tumors or organ failure.  He ruled out heart disease, fatal arrhythmias, and tumors in the brain and lungs.  Dr. Natarajan further noted, corroborated by the hospice nurse's notes and testimony, that Carolyn experienced apnea (interruptions in breathing) leading up to her death, which can be an outward sign of narcotic intoxication.

This is not a case in which an expert stated a bare opinion without offering any plausible data to support that opinion.  *See Guile*, 422 F.3d at 227.  Dr. Natarajan explained the basis of his opinion and disclosed the disparities between the facts at hand and the studies in his source literature.  In the sufficiency-of-the-evidence context, these alleged "analytical gaps" do not "take [the opinion] out of the realm of substantive evidence."  *Id.*  Rather, the "gaps" go to the weight of the evidence, which the jury was free to balance and

No. 08-51119

Rubsamen was free to argue. *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987).

In addition to Dr. Natarajan's testimony, the Plaintiffs-Appellees offered circumstantial evidence suggesting that Rubsamen caused Carolyn's death. Circumstantial evidence can be used to establish causation. *See Havner*, 825 S.W.2d at 459. Approximately ten days before her death, one of Carolyn's relatives saw her at a restaurant and noted that she "looked good" and seemed "happy." She did not appear to be dying, but rather engaged in conversation with the family member and was able to walk with the assistance of a cane.[5] Dr. Natarajan testified, based on his review of records of Carolyn's vital signs at a routine medical appointment a few weeks before her death, that she was "doing quite well." More significantly, there was evidence that Rubsamen may have attempted to cover up the cause of Carolyn's death: Rubsamen's housekeeper testified that, several days before Carolyn's death, she overheard Rubsamen making arrangements for Carolyn's funeral and "wanting to embalm [Carolyn] as soon as she died, like in a hurry." Phone records confirm that at least two phone calls were placed to the funeral home in the week prior to Carolyn's death. Several doctors testified at trial that the process of embalming makes taking an accurate toxicology reading more difficult. And Dr. Natarajan testified that several weeks after Carolyn's death (and prior to his involvement in the case), Rubsamen called him and questioned him about the effect of embalming on subsequent attempts to determine a cause of death. From this circumstantial evidence, the jury could have inferred that Rubsamen sought to cover up the poisoning by having Carolyn embalmed quickly.

---

[5] However, there was conflicting testimony from Carolyn's doctor that she was in the "dying process." It is uniquely within the jury's province to weigh the evidence and make credibility determinations. *See, e.g.*, *United States v. Parker*, 505 F.3d 323, 331 (5th Cir. 2007); *Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 362 (5th Cir. 2004).

Rubsamen has failed to establish that there was "no legally sufficient evidentiary basis for a reasonable jury" to find that she poisoned Carolyn. *Travelers*, 542 F.3d at 481–82.  The jury was free to rely on Dr. Natarajan's opinion and the significant circumstantial evidence to conclude that Rubsamen caused Carolyn's death.  Furthermore, the district court did not abuse its discretion in refusing to grant Rubsamen's motion for a new trial.

## IV

Rubsamen next contends that the jury's damages award for past and future mental anguish must be reversed, or alternately, reduced because the award is entirely disproportionate to the injury, if any, sustained.  Rubsamen also urges this court to overturn the district court's award of exemplary damages.

The size of the award to which a plaintiff is entitled is generally a fact question, and the reviewing court should be "'exceedingly hesitant' to overturn the decision of the jury—the primary fact finder—and the trial judge" who entered judgment on the verdict. *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 934 (5th Cir. 1982) (citing *Bridges v. Groendyke Transport, Inc.*, 553 F.2d 877, 880 (5th Cir. 1977)).  Indeed, "[t]his court has firmly established in previous cases that it will not reverse a jury verdict for excessiveness except on 'the *strongest* of showings.'" *Foradori v. Harris*, 523 F.3d 477, 504 (5th Cir. 2008) (emphasis added) (internal citation omitted).  The jury's damage award should not be overturned unless the trier of fact abused its discretion or it is entirely disproportionate to the injury sustained. *Id.* We will uphold the denial of a new trial on damages even when we disagree with the award, unless the award "clearly exceeds that amount that any reasonable man could feel the claimant is entitled to." *Id.* (citations and emphasis omitted).  To overturn or reduce a damages award, the "extent of distortion [must] . . . be so large as to shock the conscience, so gross or inordinately large as to be contrary to right reason, so

exaggerated as to indicated bias, passion, prejudice, corruption, or other improper motive." *Id.* (internal quotations and citations omitted). If an award "exceeds the bounds of any reasonable recovery, we must suggest a remittitur ourselves or direct the district court to do so." *Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 784 (5th Cir. 1983).

Under Texas law, mental anguish damages are recoverable in wrongful death suits. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 551 (Tex. 1985), *abrogated on other grounds by Johnson & Higgins v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998); *Sanchez v. Schindler*, 651 S.W.2d 249, 253 (Tex. 1983). Mental anguish damages "ask about . . . what deleterious effect has the death . . . had upon the claimants." *Moore v. Lillebo*, 722 S.W.2d 683, 688 (Tex. 1986) (internal quotations and citation omitted). Mental anguish is the "emotional pain, torment, and suffering that the named plaintiff would, in reasonable probability, experience from the death of the family member." *Id.* There is no requirement that a plaintiff demonstrate physical manifestation of mental anguish in order to recover. *Id.* at 686–87. Indeed, the Texas Supreme Court has noted that mental anguish is often "borne in silence" and may be found based on the circumstances surrounding a loss. *Id.* (citation omitted).

## A

The jury awarded $250,000 each to Winifred, Janice, and Jessica for mental anguish suffered in the past; $50,000 each to Janice and Jessica for future mental anguish; and $75,000 to Winifred for future mental anguish.

Under Texas law, the trier of fact may consider a number of factors in awarding mental anguish damages: "(1) the relationship between . . . a parent and child; (2) the living arrangements of the parties; (3) any absence of the deceased from the beneficiary for extended periods; (4) the harmony of family relations; and (5) common interests and activities." *Id.* at 688. These factors appear to weigh against an award of mental anguish damages in this case. The

15

relationship between Carolyn and her daughters was contentious, even hostile at times. The daughters had not seen Carolyn in almost ten years at the time of her death; they did not live in the same city or visit regularly during that period. Rubsamen would have us hold that this evidence precludes an award of any past mental anguish damages.

But a family relationship between parent and child is sufficient to establish *some* evidence of mental anguish in the surviving family members. *Id.* at 685. The fact that Carolyn's daughters had a strained relationship with their mother, did not reside with her, and were not supported by her, does not, as a matter of law, preclude them from recovering mental anguish damages for her death. *See Borth v. Charley's Concrete Co.*, 139 S.W.3d 391, 397 (Tex. App.—Fort Worth 2004, pet. denied). Indeed, in *Moore*, the Texas Supreme Court required that mental anguish damages be submitted to the jury even though there was no testimony as to the effect of the son's death on his parents. *Moore*, 722 S.W.2d at 684. The deceased son was grown and did not live with his parents; his mother had not seen him for six years, nor communicated with him for two years preceding his death; his father had not seen him in two years and their only communications were two letters and one phone call; neither parent testified about their relationships with their son or the effect that their son's death had on them; and there was no evidence that the parents mourned their son's death or attended his funeral. *Id.* at 688–89. Similarly, in *Borth*, the appeals court held that mental anguish damages should have been submitted to the jury even though the deceased husband had left his wife after four years of marriage, she had only seen him twice since he left, and he provided no support to her. 139 S.W.3d at 396. Factors other than those specified in *Moore*, including testimony offered by the daughters that they hoped to reconcile, can be properly considered. *See id.* at 397. Direct evidence of the "nature, duration, or severity of a plaintiff's anguish[,] . . . disruption in his or her daily routine[,]

16

. . . or other evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger" is not required to survive a legal sufficiency challenge. *Wackenhut Corrections Corp. v. De La Rosa*, — S.W.3d —, No. 13-06-00692-CV, 2009 WL 866791, at \*34 (Tex. App.—Corpus Christi Apr. 2, 2009, no pet.). Thus, the question of mental anguish damages was properly submitted to the jury and we cannot say that the daughters were not entitled to *any* award.

The more difficult question is whether the award of $250,000 for each daughter for past mental anguish is disproportionate. "[L]ack of [direct] evidence may require the reviewing court to find that the evidence is factually insufficient to support the award's amount, given that the award must 'fairly compensate' the victim for the loss." *Id.* at \*35 (citation omitted). "While there is a presumption of some mental anguish from the death of a family member, that presumption does not also require the court to find that the evidence is factually sufficient to support an extremely large award." *Id.* (citation omitted). The reassessment of damage awards is "not an exact science," but rather is, to some extent, subjective. *Wheat v. United States*, 860 F.2d 1256, 1259 (5th Cir. 1988). To minimize unbridled subjectivity, "we compare damages awarded in factually similar cases, and arising within the controlling jurisdiction . . . ." *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1339 (5th Cir. 1990).

Both parties acknowledge that there are no cases on all fours with which we can compare the award as we are required to do. Rubsamen argues that *Living Centers of Texas, Inc. v. Peñalver*, a wrongful death suit in which the sons of an elderly woman received $250,000 each for loss of companionship and past mental anguish, illustrates the circumstances that would warrant an award of that amount. 217 S.W.3d 44 (Tex. App.—San Antonio 2006), *rev'd on other grounds*, 256 S.W.3d 678 (Tex. 2008). The evidence showed that the sons were "always close to their mother, and remained so until her death." *Id.* at 55. Even

though the sons' careers required them to move away, they eventually moved back permanently to live close to their mother. They visited every day, often several times per day and took her out of her nursing home on weekends and always on holidays. *Id.* at 56. Both sons described the accident that led to their mother's death as the worst event in their lives; they shared their grief with others, including by seeking counseling. *Id.* Rubsamen contends that in light of the quality of the relationship in *Peñalver* that warranted a $250,000 award, the award of $250,000 for each of Carolyn's daughters is unjustifiable.

It is undeniable that there was substantial estrangement between Carolyn and her daughters and that their relationships were significantly distinguishable in nature and quality as compared to the mother-son relationship described in *Peñalver*. To rebut Rubsamen's argument that neither the daughters nor Carolyn had any interest in a relationship with one another, the daughters offered evidence of attempts to reconcile or continue the relationship. Joey testified that he believed his mother, Jessica, and Carolyn continued to love each other and expressed their love for one another despite the rift in their relationship. Jessica testified that she tried to arrange a visit, which Carolyn professed to be pleased about, but that Carolyn later called back and told Jessica not to visit. Rubsamen's daughter corroborated Jessica's testimony, admitting that Rubsamen professed not to want Carolyn's daughters visiting her. Winifred testified that she had a "mother/daughter relationship" with Carolyn, that she and her sisters had made preparations to go see Carolyn the week that she died, and that she did not attend Carolyn's funeral because Rubsamen did not disclose when it would take place. Janice's testimony about her relationship with Carolyn is somewhat more troubling. Janice testified that her relationship with Carolyn was always "bad," that after her father's death she viewed the relationship as "nonexistent," and that Janice returned unopened Christmas gifts Carolyn had sent to her children. But Janice also testified that

she "never gave up hope" of reconciling and she did not want her mother killed by somebody.

Moreover, the jury heard testimony about Rubsamen's attempts to thwart any reconciliation between Carolyn and her daughters. In relation to Jessica and Joey's proposed visit to Carolyn, Rubsamen instructed Carolyn to call Jessica and tell her it was not a good time and they could not visit. Rubsamen's daughter testified that Rubsamen felt her position as a daughter-figure was threatened by the chance that Carolyn and her daughters would reconcile and that she did not want the daughters visiting because they would "undo all that she had done." Carolyn's nurse testified that Rubsamen repeatedly told Carolyn that her daughters did not love her, that they wished she would die, and that they should not reconcile. In light of this evidence, Rubsamen's argument that no relationship existed and that the daughters essentially abandoned their mother is of minimal probative value.

The Texas Supreme Court has indicated a willingness to infer past mental anguish in cases involving disturbing events, such as intentional torts. *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 442 (Tex. 1995) ("[O]nce particularly disturbing events [are] proved . . . the law generally allow[s] the claimant's mental suffering to be presumed to flow from such events."); *Moore*, 722 S.W.2d at 685. As distinguished from *Peñalver*, which involved a negligently caused death, the jury here found that Rubsamen intentionally caused Carolyn's wrongful death. An intentionally caused death certainly qualifies as a "disturbing event." The jury could reasonably conclude that losing one's parent because that person was intentionally killed would cause more trauma and anguish than if that parent died as a result of an accident. Although the mother-daughter relationships were clearly strained, contentious and estranged, the evidence also showed that Rubsamen made substantial (and successful) attempts to interfere with the relationships between Carolyn and her daughters.

No. 08-51119

These facts coupled with the intentional wrongful death leave us persuaded that the award of $250,000 is not so high as to "shock the conscience." Thus, we will not disturb the past mental anguish damages award.

**B**

The jury also awarded $50,000 each to Janice and Jessica for future mental anguish and $75,000 to Winifred for future mental anguish. To recover damages for future mental anguish, a plaintiff must present evidence demonstrating a reasonable probability that the plaintiff will suffer compensable mental anguish in the future. *See Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008). Typically, this requires a showing that in the future, the plaintiff will suffer mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Id.* at 916–17 (quoting *Woodruff*, 901 S.W.2d at 444). The Plaintiffs-Appellees here adduced no evidence of future mental anguish. Accordingly, we reverse the award of future mental anguish as to each of the daughters.

**C**

Exemplary damages were tried to the district court and it awarded the statutory maximum of $750,000 to be divided equally among Carolyn's three daughters.[6] On appeal, Rubsamen contends only that the exemplary damages award must be overturned because there was no legally competent evidence that Carolyn died from a morphine overdose or that Rubsamen administered a lethal dose of morphine, or alternatively, that the exemplary damage award must be proportionally reduced because the mental anguish damages were excessive.

---

[6] Under Texas law, a plaintiff who is statutorily permitted to recover damages for wrongful death may also recover exemplary damages if the plaintiff proves by clear and convincing evidence that the harm to the decedent resulted from fraud, malice, or gross negligence on the part of the defendant. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a). Rubsamen makes no argument that the damages were not proved by clear and convincing evidence. Accordingly, any such contention is waived. *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001).

20

No. 08-51119

Rubsamen's argument that exemplary damages must be reversed fails because, as discussed *supra*, we found the evidence sufficient to support the wrongful death verdict. Her argument that exemplary damages must be reduced likewise fails. The district court set exemplary damage at $250,000 for each of the daughters, which was an amount equal to the past mental anguish damages, and not in excess of the $750,000 limit set by TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b).

## V

Rubsamen also challenges the jury's finding that she and Peters entered into a conspiracy to cause Carolyn's death. Under Texas law, the essential elements of a civil conspiracy are: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as a proximate result." *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). Civil conspiracy requires "specific intent" to agree "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996) (internal quotations and citation omitted). "The parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement." *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995). Proof of intent to participate in the conspiracy is necessary to meet the "meeting of the minds" element. *Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206, 216 (Tex. App.—Houston 1991, no writ). Intent can be proven by circumstantial evidence and reasonable inference. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 858 (Tex. 1968). In determining the legal sufficiency of this evidence, we must draw all reasonable inferences and resolve all credibility determinations in favor of the verdict. *Travelers Cas.*, 542 F.3d at 481.

No. 08-51119

Rubsamen contends that there is no evidence of a meeting of the minds. She further reiterates that there is no evidence that she administered an overdose of morphine, such that there was no overt act in furtherance of the alleged conspiracy. Plaintiffs-Appellees presented ample evidence of a longstanding, close relationship between Rubsamen and Peters. Peters testified that he would "do anything" for Rubsamen. The Plaintiffs-Appellees presented evidence that Peters lived with Rubsamen and Carolyn through the last years of Carolyn's life, that Peters was largely at Rubsamen's beck and call, and that doing "anything" for Rubsamen included acting as an armed bodyguard. Peters testified that he saw Rubsamen administer morphine to Carolyn in the last days of her life and that he and Rubsamen were the only people present when Carolyn died. Plaintiffs-Appellees argue that the most damning evidence of the conspiracy is that Peters testified at his deposition that a couple of days *before* Carolyn died, he drove Rubsamen to the funeral home to make funeral arrangements. Then, at trial he switched his story, claiming that he "made a mistake" in his deposition testimony and "wouldn't ever go to a funeral home when someone is not dead."

The jury was free to disbelieve Peters's claim at trial that he was mistaken when he previously testified that he took Rubsamen to the funeral home before Carolyn's death. Taking the evidence in the light most favorable to the verdict, as we must, a meeting of the minds could be found based on the reasonable inference that Peters and Rubsamen would have discussed why they were going to the funeral home in advance of Carolyn's death or that by taking Rubsamen to the funeral home Peters knew that Rubsamen was going to cause Carolyn's death. As Peters put it, "[w]ho could go to a funeral home when someone's not dead?" "We must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable." *McBeth*, 565 F.3d at 176 (citation omitted). And even though no direct evidence showed that Rubsamen

No. 08-51119

and Peters discussed the details of Carolyn's death in advance, such a formal discussion is not necessary. Conspiracy agreements "need not be formal, the understanding may be a tacit one, and it is not essential that each conspirator have knowledge of the details of the conspiracy." *Bourland v. State*, 528 S.W.2d 350, 354 (Tex. App.—Austin 1975, writ ref'd n.r.e.).

Moreover, financial gain can be a motive to conspire. *See Times Herald Printing Co. v. A.H. Belo Corp.*, 820 S.W.2d 206, 216 (Tex. App.—Houston 1991, no writ). Rubsamen stood to gain control of all of Carolyn's assets upon her death. Based on the long-time, close relationship between Rubsamen and Peters, one could reasonably infer that Peters might benefit from Rubsamen's financial gain.

Rubsamen also argues there is no evidence of an unlawful, overt act. But as we have already discussed above, there was sufficient evidence supporting the jury's finding that Rubsamen intentionally caused Carolyn's death. Accordingly, there was sufficient circumstantial evidence to support the jury's finding of a conspiracy and the district court did not err in refusing to grant a new trial.

## VI

The jury found that Rubsamen tortiously interfered with Joey Clark's inheritance and awarded $3 million in damages to him. Rubsamen contends that there is no evidence of any tortious interference with Carolyn's wills, nor any evidence of property that would have passed by will. Accordingly, she requests that the jury's verdict be set aside.

Rubsamen notes that the Texas Supreme Court has not recognized a cause of action for tortious interference with inheritance, but that Texas's appellate courts do recognize it.[7] *In re Russell*, – S.W.3d —, 2009 WL 3855950, at *5 (Tex.

---

[7] We would usually look to a decision of the Texas Supreme Court to determine the existence and elements of a cause of action. However, in this case, we need not undertake an *Erie* guess as to whether the Texas Supreme Court would, in fact, recognize such a cause of action because Rubsamen makes no challenge to the existence of a claim for tortious

No. 08-51119

App.—El Paso Nov. 18, 2009, no pet.); *King v. Acker*, 725 S.W.2d 750, 754 (Tex. App.—Houston 1987, no writ) (holding that a claim for tortious interference with inheritance exists under Texas law).  The cases to have considered the cause of action define it as:

> One who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that would otherwise have been received is subject to liability to the other for loss of the inheritance or gift.

*Acker*, 725 S.W.2d at 754 (citing RESTATEMENT (SECOND) OF TORTS § 774B (1979)).  The jury was instructed that the evidence must show by a preponderance that: "(1) there is a reasonable probability that Carolyn . . . would have *devised* a gift or inheritance to [Joey];" (2) "Rubsamen interfered with [Joey's] expected gift or inheritance;" (3) "this interference was intentional, was independently tortious, or was unlawful and caused damage; and" (4) "the interference was conducted with neither just cause nor legal excuse." (emphasis added).  Focusing on the legal meaning of the word "devise," Rubsamen argues that the jury could only find a tortious interference with respect to real or personal property that would have been passed by *will*, not through trusts or other mechanisms.  Plaintiffs-Appellees contend that Rubsamen's argument is hyper-technical and the jury was free to consider Joey's expectation on a gift through trust or other *inter vivos* instrument.

To the extent that Rubsamen is challenging the jury instructions or complaining that the word "devise" should have been specifically defined for the jury, our review is limited to plain error because she failed to make any objections at trial.  *See Septimus v. Univ. of Houston*, 399 F.3d 601, 606–07 (5th

---

interference with inheritance.  We note that both parties rely on Texas Court of Appeals decisions—which have uniformly recognized the claim, either explicitly or implicitly—as the basis for the tortious interference with inheritance claim and we offer no opinion as to how the Texas Supreme Court might view such a claim.

Cir. 2005).  The jury instructions essentially mirror the elements of tortious interference with inheritance as defined by RESTATEMENT (SECOND) OF TORTS § 774B, which the Texas appellate courts have adopted.  We see no plain or obvious error in these instructions, nor does Rubsamen point to any specific error other than to argue a specific meaning for the word "devise."

Rubsamen's argument draws force from her misplaced focus on the noun, "devise," which she contends must be understood as a legal term, that is, a "testamentary disposition of real or personal property, or of both" or "to dispose of real of personal property, or of both, by will."  TEX. PROB. CODE ANN. § 3(h).  However, the noun, "devise," is not contained in the jury instructions.  Rather, the jury instructions used the verb "devised."  While Rubsamen may be correct that the word "devise" must be understood to have particular legal connotations, the verb "devised" means in lay terms "to divide" or "to distribute."  OXFORD ENGLISH DICTIONARY 574 (2d ed. 1991).  Moreover, the instructions explicitly allowed a finding of interference not only with an "inheritance," but also with a "*gift*."  A jury could reasonably understand the instructions as a whole to mean that interference with a gift, as opposed to property specifically dealt with through a will, was sufficient to find Rubsamen liable.  Furthermore, the jury was instructed that "[i]t is the right of every citizen of the State of Texas to *dispose* of his or her property by will or *trust* . . . ." (emphasis added).  The use of the verb "dispose" in this instruction is synonymous with the use of the verb "devised."  Thus, based on the complete instructions, the jury was not limited to considering property passed only by will but could have considered any gift or inheritance.[8]

---

[8] Rubsamen argues at length that there was no evidence that Carolyn's wills and codicils omitting Joey as a beneficiary were the result of tortious interference.  This argument is misplaced.  Rubsamen specifically objected to the jury considering tortious interference and undue influence with respect to Carolyn's wills and codicils.  The district court sustained that objection and the jury was not asked to make any determinations about those documents.

No. 08-51119

However, at trial the Plaintiffs-Appellees argued that the tortious interference and undue influence claims each dealt with distinct property.[9] Specifically, they identified "Clark family heirloom silver," "Clark family jewelry," Clark's personal property, and "the other one-half interest of the mansion that would have remained in the C&H Trust and eventually transferred to Carolyn Clark, personally, at the death of Virginia Haynes" as the subject of the tortious interference claim and the trust property as the subject of the undue influence claim. On appeal, Plaintiffs-Appellees appear to argue that the tortious interference claim affected property held in trust.[10] Plaintiffs-Appellees are estopped from now arguing that the tortious interference claim extends to trust property, rather than the property previously identified as passing through Carolyn's estate. *See In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) (noting that judicial estoppel precludes a party from "playing fast and loose with the courts to suit the exigencies of self interest" by precluding the party from adopting an inconsistent position from that taken earlier (internal quotation marks omitted)). Accordingly, the tortious interference claim was properly limited to the jewelry, silver, and other personal effects that Plaintiffs-Appellees identified at trial.

---

Furthermore, the Plaintiffs-Appellees did not seek to have any wills, trusts, or other legal documents set aside or to recover any of the probate property, even with respect to the undue influence claim. Rather, they sought monetary damages. Accordingly, it does not appear that either the tortious interference or undue influence verdicts, awarding monetary damages, would affect the property that might be the subject of any ongoing probate proceedings.

[9] Rubsamen argued that the $2 million and $3 million awards represented a double recovery because the tortious interference and undue influence claims related to the same property. Plaintiffs-Appellees asserted that the property at issue in each claim was distinct to avoid running afoul of Texas's "one-satisfaction rule," which allows only one recovery for a single injury caused by multiple wrongful acts. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390–91 (Tex. 2000).

[10] Plaintiffs-Appellees reference money and investment accounts, oil and gas interests, and assets held by the partnership that Carolyn created, rather than the jewelry, silver, and other personal property that they identified in their trial briefing.

No. 08-51119

However, we disagree with Rubsamen's contention that there was no evidence identifying the property with which she interfered. Plaintiffs-Appellees presented a lengthy hand-written inventory of silver and descriptions of some jewelry. When Rubsamen was asked what had become of these items she gave a variety of conflicting answers and ultimately was unable to convincingly explain where it was. The jury could have reasonably concluded that Rubsamen wrongfully disposed of jewelry and silver. Nonetheless, there was insufficient evidence to sustain the tortious interference finding as to this property because there was no evidence that Joey ever expected to receive silver, jewelry, personal property, or one half of the Las Brisas house,[11] or that Carolyn, in reasonable probability, would have left this property to Joey. The only testimony concerning Joey's expectations was that at one time Carolyn intended that he be her heir, that she created a trust for his benefit, and that she would leave him at least enough money to start a small business as well as a roll-top desk owned by his grandfather.[12] The jury could not reasonably find that Joey had an expectation in inheriting silver, jewelry, or other personal property.

## VII

---

[11] Plaintiffs-Appellees' claim regarding the Las Brisas house is not entirely clear. They appear to contend that Virginia's one-half interest would have passed personally to Carolyn such that it would have constituted "personal property," for which Plaintiffs-Appellees sought monetary damages (i.e. the value of the divided interest in the home) under the tortious interference claim. However, there was no evidence that Carolyn would have received an ownership right in Virginia's one-half interest. Rather, Virginia's interest was to revert to the C&H Trust and Carolyn, as the surviving sister, was entitled to a life interest in the property.

[12] Because we conclude that there is not sufficient evidence to support a finding of tortious interference with respect to the property identified by Plaintiffs-Appellees as the subject of this claim, we need not make any determination whether the amount of damages awarded by the jury can be sustained. We do note, however, that there appears to be little in the record to support an award of $3 million for tortious interference with gifts of silver, jewelry, personal effects, and the one-half interest in the Las Brisas house that purportedly would have passed to Carolyn upon her sister's death.

No. 08-51119

The jury found that Rubsamen unduly influenced Carolyn to execute a number of trust documents[13] and awarded Joey Clark $2 million in damages. Rubsamen contends that at most the evidence shows an *opportunity* for undue influence, but not undue influence itself. Rubsamen requests that we vacate the judgment of undue influence or grant a new trial on the issue.

To show undue influence, a plaintiff must prove: "(1) the existence and exertion of an influence; (2) the effective operation of such influence so as to subvert or overpower the mind of the testator at the time of the execution of the testament; and (3) the execution of a testament which the maker thereof would not have executed but for such influence." *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). The evidence must show more than mere opportunity to exercise influence. *Dulak v. Dulak*, 513 S.W.2d 205, 209 (Tex. 1974). Undue influence may be proved by circumstantial evidence. *Rothermel*, 369 S.W.2d at 922. "[T]he circumstances relied on as establishing the elements of undue influence must be of a reasonably satisfactory and convincing character, and they must not be equally consistent with the absence of the exercise of such influence." *Id.* Establishing undue influence involves an "inquiry as to the nature and type of relationship existing between the testator, the contestants and the party accused of exerting such influence." *Id.* at 923. Factors to be considered include the "opportunities existing for the exertion of the type of influence or deception possessed or employed, the circumstances surrounding the drafting and execution of the testament, the existence of a fraudulent motive,

---

[13] The trusts at issue here include: the Patricia Ann Rubsamen Trust ("PAR Trust") the Clark Term of Year Trust II ("Term Trust II"), the Joseph & Carolyn Trust II ("J&C Trust II"), and Amendment No. 4 to JCJ Clark Limited Partnership ("Amendment 4"), all executed on August 17, 2001; the Designation of Successor Trustee of the Joseph Grady Clark Trust and other Trusts, executed on November 15, 2001; the Designation of Successor Trustee, executed on February 6, 2003; and the General Warranty Deed, executed on April 13, 2004.

28

No. 08-51119

and whether there has been an habitual subjection of the testator to the control of another." *Id.*

Rubsamen argues that this case is factually similar to *Rothermel* and *Dulak*. *See Dulak*, 513 S.W.2d at 207; *Rothermel*, 369 S.W.2d at 920. *Rothermel* involved a will drafted by Mrs. Rothermel's son, Louis, that left her entire estate to him rather than equally to her grandchildren. Mrs. Rothermel, a 93-year-old suffering from "common maladies of age," lived with Louis. *Rothermel*, 369 S.W.2d at 920. He handled all of her affairs and their relationship was described as loving and trusting. Mrs. Rothermel also had good relations with her other son's widow and her grandchildren. *Id.* Shortly before her death, Mrs. Rothermel asked Louis to draft a new will leaving her entire estate to him. *Id.* at 921. The Texas Supreme Court reversed the judgment of undue influence, finding that although Louis had the opportunity to exert undue influence, there was no evidence that he actually did exert such influence. *Id.* at 922.

*Dulak* similarly involved an effort to overturn the release of a promissory note on the basis that it was unduly influenced. 513 S.W.2d at 206. Dulak, the father of nine children, maintained a close relationship with only one of his sons. Because of his age and frailty he eventually moved in with his son. *Id.* at 208. Dulak fell and broke his hip in his son's home. He delayed going to the hospital because he had previously fallen and recovered without assistance. During the time that the family waited for Dulak's doctor to respond to his call, Dulak asked his son to write a release of the promissory note owed by the son to Dulak. The Texas Supreme Court found that there was no evidence to support the plaintiffs' assertions that the jury could have inferred that Dulak was kept helpless after falling until he signed the release. *Id.* at 209.

Rubsamen contends that as in *Rothermel* and *Dulak*, the circumstantial evidence shows that she had a loving relationship with Carolyn and that Carolyn chose to reward Rubsamen at the expense of her family. But she focuses only on

29

limited testimony regarding the circumstances surrounding the execution of the relevant trust documents. For instance, Carolyn's long-time estate planning lawyer, Earl Croman, who drafted the trust documents executed in August 2001, testified that Carolyn "always seemed to be of her own mind" and was not "subject to the influence of anyone." The notary who executed those documents testified that "as far as [she] could tell" Carolyn was in her right mind and that she would not have notarized the documents if it appeared otherwise. At Rubsamen's urging, Croman was replaced by G. Ray Miller, an attorney who also represented Rubsamen's husband. Miller prepared the successor trustee designation that Carolyn executed in November 2001. He testified that he met privately with Carolyn and, based on conversation and observation, satisfied himself that she was not acting under another's influence. Another notary testified that when Carolyn executed a successor trustee document in February 2003 she appeared to be of sound mind. A notary also testified that Carolyn seemed of sound mind when she executed a warranty deed in April 2004.

Rubsamen also argues that her case is stronger than *Rothermel* and *Dulak* because in those cases the person alleged to have unduly influenced the decedent actually drafted the documents at issue, whereas Rubsamen was not involved in the drafting of any of the relevant documents. Rubsamen's reliance on these cases is misplaced. Were we to find *Rothermel* and *Dulak* indistinguishable, we would have to ignore, as does Rubsamen, the evidence contrary to her position. For instance, there was evidence that Carolyn suffered from pain that at times was debilitating and required increasingly strong doses of narcotic pain medication to manage. Miller's file notes indicate that he was aware that Carolyn was on pain medication and that it made her "forgetful." He admitted that had he known about the effects of the medication at the time Carolyn was executing estate documents, he might have made more of an inquiry into her capacity. Toward the end of her life, Carolyn was fully dependent on her

caretakers for almost all of her needs including her food, bathing, transportation, and companionship. Such evidence, tending to show some degree of mental and physical incapacity or frailty, is relevant and cannot be ignored. *See Rothermel*, 369 S.W.2d at 922.

There was also evidence from which the jury could find that the influence Rubsamen exerted was or became undue. Rubsamen inserted herself into every aspect of Carolyn's life and fostered an atmosphere of distrust and tension among the family members. At some point during their relationship, Rubsamen began representing herself as Carolyn's step-daughter. Carolyn spent all of her time with Rubsamen with the exception of a once-weekly hair appointment. When Rubsamen moved in with Carolyn, she enlisted the help of her high-school friend, Peters, to act as an armed bodyguard against some amorphous threat in which Rubsamen and Peters apparently believed. Rubsamen monitored and screened Carolyn's calls, and even family members could not visit with Carolyn unless Rubsamen was present. Rubsamen interfered in the relationship between Carolyn and her sister Virginia. Virginia's son testified that Virginia was distraught because Rubsamen separated and isolated the sisters and created an atmosphere akin to an "armed camp" within their home. Although Carolyn and her children had strained relations, in 2004 Jessica and Joey called Carolyn to arrange a visit. Carolyn's long-time housekeeper testified that Carolyn was excited about the visit. But Rubsamen instructed Carolyn to call Jessica and tell her that she could not visit, after which Carolyn was visibly depressed. Rubsamen's own daughter testified that Rubsamen did not want Jessica and Joey to visit because they might undo all that she had done. Others testified that Rubsamen gave specific instructions that family members not be allowed into the house. On a rare occasion that some members of Carolyn's family were able to visit with her alone, she stated: "I'll meet with you this one time. If you mention Pat[] [Rubsamen's] name, I've been instructed to leave the

31

room by Pat." Carolyn's family came to believe she had been "brainwashed" and had a "master-slave relationship" with Rubsamen. There was also testimony that Rubsamen portrayed Carolyn's family in a negative light to Carolyn and spread rumors, including that Carolyn's nephew assaulted Rubsamen, that the nephew's wife was a threat to Rubsamen's life, and that Carolyn's grandson Joey was gay and was "getting into a bad crowd of black people."

Further, one of Carolyn's nurses testified about a troubling incident in 2001 when Carolyn suffered a pleural effusion (an accumulation of fluid between the layers of the tissue lining the lungs and the chest cavity), for which she needed treatment in San Antonio. Carolyn, Rubsamen, and the nurse traveled to San Antonio and were booked to stay in adjoining hotel rooms the night before the procedure. The nurse testified that although she and Rubsamen were to share a room, Rubsamen instead went to and stayed in Carolyn's room next door. The nurse could hear raised voices and the sound of Carolyn crying. Rubsamen never returned from Carolyn's room. The next morning, Carolyn announced that she had canceled the procedure and instead wanted to immediately go to a notary to have legal documents changing her estate plan (in Rubsamen's favor) notarized.

There was also evidence demonstrating that Rubsamen exerted control over Carolyn's legal affairs. Rubsamen convinced Carolyn to switch estate planning attorneys to use Miller instead of the long-time attorney that Carolyn and her husband had used. Although Miller stated that he understood he was representing Carolyn, he spent a disproportionate amount of time communicating with Rubsamen, not Carolyn. After two initial meetings with Carolyn, totaling about five hours, Miller's billing statements (addressed to Rubsamen) indicate that he communicated almost exclusively with Rubsamen. Miller engaged in lengthy telephone calls with Rubsamen about Carolyn's estate planning documents and provided those documents to Rubsamen for her review

and approval. Miller's files also reflect a message in which Rubsamen expressed concern about Carolyn's partnership documents, stating "we could be in real big trouble depending on which of the trusts are still active" and "it doesn't look good," although Miller did not recall taking any action in response to the message.[14]   Miller was warned by Carolyn's nephew that it seemed like Rubsamen was "confusing" Carolyn, but Miller did not ever attempt to ascertain from Carolyn whether she was confused or misled.

Rubsamen became intimately involved in Carolyn's financial affairs, eventually consolidating all of Carolyn's assets into an estate plan for Rubsamen's benefit. Carolyn's estate comprised a complicated network of trusts and a partnership. To fully understand the undue influence claim requires some discussion of these arrangements. Carolyn and her husband created the Joseph Grady Clark Trust ("JGC Trust") for their grandson Joey's benefit. They also created a number of other trusts, of which Carolyn was trustee, that were all members of the partnership. The partnership owned most of the assets of Carolyn's estate including real property in Texas and Pennsylvania, mineral leases, investment and bank accounts, and Carolyn's interest in the C&H Trust, which originally held her one-half interest in the Las Brisas house.[15]   The Partnership Agreement created divided interests in this property and specified how those interests were to be distributed among the member trusts as general and limited partners. The Partnership Agreement increased the partnership interests of some of the trusts over time, while decreasing the interests of the other trusts over time, such that full control over the partnership would eventually vest in one of the trusts for Joey's benefit.

---

[14] It is unclear to whom the "we" in this message refers.

[15] The C&H Trust was created by and between Carolyn and Virginia to hold each of their one-half interests in the Las Brisas house. Late in Virginia's life, Carolyn and Rubsamen got Virginia to sign papers to dissolve the C&H Trust.

Then in August 2001, Carolyn created the Patricia Ann Rubsamen Trust ("PAR Trust") and that same day, executed an amendment to the partnership, which named the PAR Trust as a 98% partner and terminated the interests of all of the trusts that were the original partners. The remaining 2% interest in the partnership was divided equally between two new trusts, the Term Trust II and the J&C Trust II. Carolyn was initially the trustee of each of these trusts. But in November 2001, she designated Rubsamen as the successor trustee to each of these trusts. Then in February 2003, Carolyn executed another document reiterating Rubsamen's role as successor trustee for each of the trusts and naming her as the successor managing partner to the partnership. After Virginia died, Rubsamen purchased Virginia's stake in the Las Brisas house. In April 2004, Carolyn executed a general warranty deed for her one-half interest in the house which she placed in the PAR Trust.

The effect of these various documents was to consolidate power over Carolyn's estate in Rubsamen's hands. Through the partnership, Rubsamen had control over real property, finances, mineral leases, and combined with the warranty deed for Carolyn's half of the Las Brisas house, 100% ownership of that property.

Distinguishing this case from *Rothermel* and *Dulak* is ample testimony and evidence that Rubsamen sowed discord between Carolyn and her family, isolated Carolyn from outside contact, influenced her decision-making, created an atmosphere of paranoia and fear within Carolyn's home, and used deceit and manipulation to obtain her objectives. Even if "none of the circumstances standing alone would be sufficient to show the elements of undue influence," taken together "they produce a reasonable belief that an influence was exerted that subverted or overpowered the mind of the testator and resulted in the execution of the testament in controversy." *See Rothermel*, 369 S.W.2d at 922.

No. 08-51119

Accordingly, we find the evidence sufficient to support the jury's finding of undue influence.

However, although the district court entered judgment that the trust documents were unduly influenced in their execution, the court declined to enter judgment on the jury's damages award of $2 million. The district court offered no explanation or reasoning for its decision not to enter judgment on the damages. We assume, without deciding, that the district court was convinced by Rubsamen's post-trial arguments that entering judgment on both the jury's verdicts for tortious interference and undue influence would have resulted in a double recovery.[16] Accordingly, on that basis, we leave to the district court's determination whether it will revisit its previous decision not to enter judgment on the jury's undue influence damages award in light of our affirmance of the finding of undue influence and reversal of the tortious interference verdict. Whatever decision the district court makes, we counsel it to provide a statement of its reasons.

## VIII

For the foregoing reasons, the judgment is AFFIRMED in all respects, except that the finding of tortious interference with inheritance and the award of future mental anguish damages are REVERSED. We REMAND to the district court for any further proceedings consistent with this opinion.

---

[16] Rubsamen argued that the undue influence and tortious interference claims rested on the same factual predicate and thus recovery was subject to the "one-satisfaction rule." *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 390–91 (Tex. 2000).